# In The Matter Of:

*Kathryn Frankola vs*
*Louisiana State University School of Medicine in N.O.*

*Joseph B. Delcarpio, Ph.D.*
*June 08, 2016*

*Associated Reporters, Inc.*
*201 St. Charles Avenue*
*Suite 4315*
*New Orleans, LA 70170*
*(504) 529-3355*

Original File DELCAR.TXT
**Min-U-Script® with Word Index**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KATHRYN FRANKOLA                CIVIL ACTION NO.:
         Plaintiff                2:15-CV-05933
VERSUS                           SECTION: H(5)
LOUISIANA STATE UNIVERSITY    JUDGE JANE TRICHE
SCHOOL OF MEDICINE IN NEW      MILAZZO
ORLEANS, and BOARD OF          MAGISTRATE JUDGE
SUPERVISOR OF LOUISIANA      MICHAEL NORTH
STATE UNIVERSITY AND
AGRICULTURAL and MECHANICAL
COLLEGE

                    *    *    *    *    *    *

         The deposition of JOSEPH B. DELCARPIO, PH.D., in the above-entitled cause, pursuant to the following stipulation, before Dorothy N. Gros, a Certified Court Reporter, authorized to administer oaths of witnesses pursuant to Section 961.1 of Title 13 of the Louisiana Revised Statutes of 1950, as amended, reported at Louisiana Department of Justice, Litigation Division, 400 Poydras Street, Ste. 1600, New Orleans, Louisiana, on Wednesday, June 8, 2016, beginning at 10:02 a.m.

2

APPEARANCES:

LAW OFFICE OF JON G. BETHUNE, LLC
(BY:  JON G. BETHUNE, ESQ.)
4701 Tchoupitoulas Street, Suite B
New Orleans, Louisiana  70115
     For:  Kathryn Frankola

LOUISIANA DEPARTMENT OF JUSTICE
LITIGATION DIVISION
(BY: MICHAEL KELLER, ESQ.)
400 Poydras Street, Suite 1600
New Orleans, Louisiana  70130
     For: Louisiana State University School of
          Medicine in New Orleans, Board of
          Supervisors of Louisiana State
          University, Agricultural and Mechanical
          College

REPORTED BY: DOROTHY N. GROS, CCR
             CERTIFIED COURT REPORTER

3

I N D E X

                                       PAGE
Caption . . . . . . . . . . . . . . . .1
Appearances . . . . . . . . . . . . . .2
Stipulation . . . . . . . . . . . . . .4
Certificate . . . . . . . . . . . . .102
Examination By:
     MR. BETHUNE . . . . . . . . . .5
                    E X H I B I T S
     Exhibit A . . . . . . . . . . . . 41
     Exhibit B . . . . . . . . . . . . 57
     Exhibit C . . . . . . . . . . . . 75
     Exhibit D . . . . . . . . . . . . 78
     Exhibit E . . . . . . . . . . . . 90
     Exhibit F . . . . . . . . . . . . 95

4

S T I P U L A T I O N

It is stipulated and agreed by and between all parties that this deposition is hereby being taken pursuant to the Federal Rules of Civil Procedure;

That all formalities, including those of sealing, certification and filing, reading and signing, are waived;

That all objections, save objections as to the form of the question and the responsiveness of the answer, are reserved until such time as this deposition, or any part thereof, is used or sought to be used in evidence at the time of the trial of the matter;

It is further stipulated that Dorothy N. Gros, in her capacity as a Certified Court Reporter, may swear in the witness.

*   *   *   *   *   *

Dorothy N. Gros, Certified Court Reporter in and for the State of Louisiana.

5

JOSEPH B. DELCARPIO, PH.D.,

667 E. Main Street, New Iberia, Louisiana

70560, after being first duly sworn in the

cause, testified as follows:

E X A M I N A T I O N

BY MR. BETHUNE:

Q.   Dr. Delcarpio, I represent Kathryn

Frankola in a case that's pending in the

Eastern District Court.  I'm sure your attorney

spoke to you about it.

A.   Yes.

Q.   I'm going to be asking you a whole

bunch of questions about Kathryn Frankola, her

history at LSU School of Medicine.  Also, just

be aware that the case has Board of Supervisors

of Louisiana as a defendant.  When I refer to

LSU, I'm referring to Board of Supervisors and

I'm going to use LSU and School of Medicine

interchangeably.

A.   Sure.

Q.   I didn't catch it, but I know the court

reporter asked you.  Can you state your full

name and address?

A.   Joseph B. Delcarpio, 667 East Main

Street, New Iberia --

6

Q.    Wait, one second.

A.    Oh, I'm sorry.

Q.    667 --

A.    East Main.

Q.    Street?

A.    Yeah, New Iberia, and the zip is 70560.

Q.    And when I'm asking you the questions, just make it clear for the court reporter.  I don't know if you've ever sat in for a deposition before.

A.    A long time ago.

Q.    So instead of nodding your head, please say "yes" or "no" --

MR. KELLER:

And let him finish his question before you answer.

BY MR. BETHUNE:

Q.    Thank you.  And also, I'm not asking you to speculate.  If you don't understand the question, feel free to ask me to rephrase it a certain way and I'll be happy to do that.  Can you give me an outline of your employment history starting around college and if there is about 10 to 15 separate employers, I don't need to know each one.  Maybe you can make it

7

general, at first, and I'll ask questions if I feel like I need to.

A. So my first employer when I was a freshman in college would be Winn Dixie on Metairie Road and that would be in 1966.

Q. How old are you?

A. I'm 67. And then I worked next at Western Auto. Again, that would be probably from my sophomore year in college and I worked actually full-time and went to college part time. And then I was hired as an Orleans Parish school teacher, I think, in the fall of 1973.

Q. How long were you a teacher for?

A. So I taught there from 1973 until 1980 when I took, I think, a sabbatical to begin my masters of science degree at UNO. And then I worked -- I can't remember now. I think I went back after a sabbatical because you have to pay back your time. And then I was -- I started -- after I did my master's degree, I graduated in 1980 and I took a job as a technician at the LSU School of Medicine in New Orleans in the Department of Anatomy. And I worked there for about a year and began graduate school in 1981 and continued until I graduated there as a

8

teaching assistant in Department of Anatomy until 1986. At that time, I became a post-doctoral fellow in William Claycomb's lab in the Department of Bio-Chemistry and Molecular Biology and I worked in Bill's lab for about a year and a quarter. The second part of that year, I became an American Heart Fellow and then I got the job opening in the Department of Anatomy and I took that position as an instructor beginning in anatomy in 1981 or 82. And then from that point forward, it was the usual progression through teaching tenure, research and so on. I became -- I don't remember the exact date, so I became an assistant professor and I don't remember the deadlines first. Then I became an assistant, then an associate, then a full professor within the School of Medicine. I was always -- my basic science department was Cell Biology and Anatomy. And then I went into administration, I believe, the spring of 2000 working as the assistant director for research in the Office of Research Services which is under Vice-Chancellor Joe Mosbacher (phonetic). And then in the late spring of 2005, I was offered the

9

position of Associate Dean in Student Affairs and Records which I was one of the candidates because you had to apply. You had to go through -- you had to go through the state -- the application process, is my understanding. But in that process, Katrina came and so because of Katrina, I was appointed interim or acting Associate Dean because of all the financial exigency and all the problems we had with that so they could, I think, bypass the normal process since I was one of the candidates. And that was it. So then I became, I think in the spring of 1990 -- of 2006, is when I became -- went from acting to Associate Dean full time. And I retired from that position May 31st of this year.

Q.   So you're no longer employed --

A.   No, sir.

Q.   -- by LSU? Are you employed in any capacity by another employer right now or are you fully retired?

A.   I'm fully retired.

Q.   And when you retired with LSU, the last status you had, the last title you had was Associate Dean of Students?

10

A.   Right, Student Affairs and Records and Professor of Cell Biology and Anatomy.

Q.   Can you give me a description of what your job entailed, what your duties were, a general description?

A.   So the primary charge is obviously to oversee promotion processes with students.  And again, we act as an ex-officio, a non-voting person.  I organize records and organize the meetings and then the chair of the Committee is a faculty member who's not associated with a department.  And so I bring those records -- I did that for the first and second year of the Pre-Clinical Promotions Committees and the third and fourth year, which is Clinical Sciences Promotions Committees.  Most of my capacity is advising students.

Q.   Can you describe that to me?  You said you act as an ex-officio.

A.   Right.  And so I would -- if this was our meeting here, Mr. Keller would be the chairman of the Committee.  I would present the students to the Committee in terms of, "Here's Mr. So and So, and here's his grades, and here's his demographic material," from their

AMCAS applications.  And then the Committee then would either make the -- have a discussion about it and then they would do what they needed to do, vote if they have to vote for a promotion or not.  Depending on the student's circumstances, the Committee may want to interview the student, as well.  And so I would make those arrangements.

Q.   So were you involved in the admission of students, new students?

A.   Yes.  As one of the charges that we -- that the school likes through the -- they like their Associate Dean or someone from the Office of Student Affairs, usually it's the Associate Dean, to be on the Admissions Committee.

Q.   And you were also involved with the ongoing student activity and working with students?

A.   Correct.  So I taught full time.  So besides my responsibility as a Associate Dean, and that's only one of them by the way, the Promotions Committees.  The other one is, of course, helping students prepare for Step 1 and Step 2, the license exams, meeting with students in terms of career guidance and, of

12

course, managing the office staff, as well. The transition changed managing grades. Those are now handled through the Registrar's Office so we don't do that directly. We hound students to make sure that the third and fourth years get their grades in from outside rotations, but we don't actually enter the grades and track the grades anymore. That's all handled through the Registrar's Office. So in addition to the teaching, those are the other responsibilities. What was your other question? I'm sorry.

Q.   That was it. And let me take a step back.

A.   Sure.

Q.   I never asked you what your educational background was. I know you told me some, but if you could briefly just give me all of your degrees, licenses.

A.   So my terminal degree is a PhD in Anatomy and Cell Biology. So I have a bachelor's degree, a BA in Biological Sciences from the University of New Orleans. And then I have a master's degree -- a Master's of Science Degree in Biological Sciences from UNO, as

13

well. I had certification as a secondary teacher because I taught in Orleans Parish for those eight years or so from 1972 to 1980. Then I earned my PhD in cell biology anatomy. I did a post-doctoral fellowship for a year and a half under Bill Claycomb in the Department of Biochemistry and Molecular Biology and so that's it. That's it, really. I think so.

Q. And you said you retired on May 31st, 2016?

A. Yes, sir.

Q. Did LSU receive federal funding while you were working there, to your knowledge?

A. Sure, absolutely.

Q. In what forms?

A. I would suspect -- a lot of the research is funded through the National Institution of Health so there's a lot of funding through that. Some are funded through the National Science Foundation, NSF Funding, and I'm sure they get federal funding through CMS that support the residency programs. That's one of the big drivers, obviously for medical education. So yes, those are the three major resources right off the top of my head I

14

can think of.

Q.   And the address that you gave me, 667 East Main Street, New Iberia, Louisiana, that is your current residence?

A.   Yes, sir.

Q.   And is that a home that you own?

A.   Yes, sir.

Q.   Do you have any other residences that you may be living at?

A.   No, no.  I mean, I -- we bought that house in the spring of 2015 and so I sold the house we had in Pearl River.  I lived there until I sold it in January and then rented an apartment in New Orleans until I finished out my tenure as an LSU employee.  So there's no other residence now.

Q.   I'd like to ask you some questions about my client, Kathryn Frankola.

A.   Sure.

Q.   When did you first become acquainted with Ms. Frankola?

A.   I guess, probably in the -- probably I became aware of Kate on one of my jobs -- one of my volunteers is to be the faculty advisor for a camp for kids with special needs.  And so what

15

we do is we enlist students from the incoming class, in other words, that have been admitted to medical school as volunteers and we use the rising second year class which are transitioned from freshman to second year.

Q.   Is this the Camp Tiger Program?

A.   Right.  And so I think I became acquainted with Ms. Frankola briefly during that time.  Again, that would have been probably May of 2010.  The camp is usually the last week or so in May.  And then when I became aware of her as a student -- I really became aware of her was probably that first semester that she began, that first week of the first semester.

Q.   As a student --

A.   As a student.

Q.   -- in the School of Medicine?

A.   Right.

Q.   When were you first made aware of her bipolar condition?

A.   So I think the first time that I knew there was a health problem was from a phone call from the emergency medicine physician. The very first day of the freshman year, we

16

instituted a number of years ago, a community service project.  And so what we do is we get the students to do projects around New Orleans.  I don't remember what we did the year when Kate was a student, but usually it's like painting the fences in the park or planting flowers post-Katrina and that's our way of getting the kids to meet one another and so on and do some service.  Well, we were taking roll, because it's also the first day of registration and so we were trying to figure out who didn't make it in and who decided not to come to school and she was one of the folks that we were missing.  And about the time the buses were getting ready to leave is when I got a phone call from one of the ER physicians that we had a student there who was having some health concerns and that they were going to recommend that she be kept for whatever.

Q.   And what's the timeframe for this again?

A.   In August 2010.

Q.   And what kind of health concerns did they tell you about and what health concerns did they --

17

A.   Well, again, I'm not a physician so I mean, he said that there were some health concerns with her behavior and that they were probably going to refer her to River Oaks. That's all I remember.

Q.   And that was around August of 2010?

A.   Yeah, that first or second week, whenever registration was that year.  I don't remember.  It's usually like the -- usually it's like the very end of the first week or the beginning of the second week in August.  It varies from year to year, depending on the calendar.

Q.   Did you have any conversations with Kathryn Frankola around this time period about her bipolar condition and about what had happened?

A.   Probably when she came back.  I think there was some conversations.  And again, I'm not a physician and neither was she and we never -- I don't recall her -- I really don't recall her using the term bipolar.  I know that we talked about the fact that she mentioned that she was having some -- she was very excited.  You could tell by our conversation.

18

It was a one-sided conversation most of the time because Kate would go on and that's a signal for me, at least.  I've seen other folks and other students in my 36 years who have had similar problems.  And so I was concerned about that, obviously she was talking and talking and talking.

Q.   Was this in an in-person conversation or was it --

A.   No, it was on the phone, usually on the cell phone.  She had called me on the cell phone.

Q.   And around -- was this around August 2010?

A.   Yeah, about that.  It was either -- there was a conversation that first week and then later on afterwards when she got back at the class because we had to get her to go back into class and one of those things was she has to be -- she had to have her permission to come back to school.  You had to have a letter, I think.

Q.   She had to have a letter to get back into school?

A.   Right, that she was ready to start --

19

right, that she should come back in.  It may have been a note from her doctor.  I don't recall exactly because she really never registered yet.  She had not begun.  So it's been six years ago so it's a little --

Q.   It's a long time.  Well, the one-sided conversation that you described to me, what did that indicate to you?  You said that it indicated -- it kind of gave you a red flag.  Those aren't your words, but --

A.   No, no.  Well, it's my concern because I've seen with other folks in the past that when they become very, very talkative one of my concerns is exactly her mental status.  But again, that's not for me to be a judge.  I just knew that it was clear that she was concerned about her behavior in that it was a behavior that would be -- that I've seen in other individuals that could have been a problem.

Q.   And you knew that she had been admitted into a medical facility for psychological issues at that point?

A.   That's right.

Q.   Did you talk with Ms. Frankola about her status as a student throughout 2010, fall

20

semester and spring semester?

A.    No, I don't recall.  To be honest, I really don't because Kate Frankola was in the MD/PhD component of our medical school programs.  So technically she was in the PhD component and that's overseen by the School of Graduate Studies.  So they actually give her a tuition waiver and so they're responsible for her.  So her grades, even though she's taking medical school curriculum, at that point she still is a PhD student under their program, the combined MD/PhD program.  So my counterpart in that school is Katherine McDonough.  Dr. McDonough is the Associate Dean for their student affairs in the School of Graduate Studies.  So that's who her real advisor is.  So it would be Dr. McDonough's duties and responsibilities really to advise Katherine.

Q.    And I know it was a long time ago.

A.    Yeah.

Q.    Do you remember communicating with her in the fall 2010 semester or the spring 2011 semester about Camp Tiger and her participation in Camp Tiger?

A.    Yeah, I think so.  I remember that she

21

had academic difficulties with physiology, I believe.  I know she had that.  She failed the course.

Q.    What semester was that?

A.    In the spring of 2011.

Q.    Okay.

A.     And I send out -- again, she -- that would have been in the spring.  So she would not have been discussed early in the first meeting we have in January.  She came up in the second meeting.  Now the problem that I talked with her about was two-fold.  One, she was a non-resident and she was in the PhD component.  So she wasn't really a medical student.  She was a MD/PhD student, still under their auspices.  However, she was --

Q.    Whose auspices?

A.    The School of Graduate Studies, Dr. McDonough.

Q.    Got it.

A.    So under those -- under that situation, she has to complete their program and they are the ones that decide who comes in and who goes out of their program.  And the other thing was that I knew she was a non-resident.  So a non-

22

resident -- non-state residents were not being admitted in the School of Medicine unless they were admitted as out-of-state residents and were the children of alumni. That was the stipulation back then and she wasn't an alumnus and she wasn't a state resident. So I knew that had she -- and again, the problem with the MD/PhD program with those students who were non-state residents, if they fail out of the PhD part, then they can't continue and come before the Committee because they're non-state residents. In effect, she never entered into the MD component. So I think I explained it.

MR. KELLER:

Now we're going to answer the question he asked you which was about Camp Tiger. That had nothing to do with Camp Tiger.

THE WITNESS:

Well it --

MR. BETHUNE:

I'm listening to --

MR. KELLER:

I mean, he's pulling a Kathryn Frankola right now.

23

THE WITNESS:

That's right.

MR. KELLER:

I'm just trying to get him focused.

MR. BETHUNE:

I object to you referring to my client in that manner.

THE WITNESS:

And the fact that made the decision whether or not she could participate in Camp Tiger.  And that was why I was getting -- that's what the ground of my thinking was there too.  She asked me if she could participate if she were not a student and I said that technically she was still a student because the Committee doesn't meet until whenever we met that year in June.  So that's what it was and I said sure.

BY MR. BETHUNE:

Q.    Tell me more about this -- the MD/PhD program.  You said that technically she wasn't a student, she was under the auspices of the School of Graduate Studies.

A.    That's correct.

24

Q.   And that was in 2010.

A.   That's correct.

Q.   Right?

A.   That's correct.

Q.   And that's according to you.

A.   That's right.

Q.   But she was taking --

A.   To my knowledge, correct.

Q.   -- classes at the School of Medicine?

A.   That's right.

Q.   And she was also working with professors at the School of Medicine?

A.   Right.  I would assume so, right, because in the PhD component -- again, that's all under the School of Graduate Studies.  So in effect -- and again, their program -- I don't know how their -- what they -- how their program ran six years ago and what their stuff was.

Q.   And that was under this MD/PhD program in 2010/2011.

A.   Uh-huh (affirmative response).

Q.   And I don't want to forget about this so I'm going to ask about this now.  So fast forward to 2013/2014, she was a student at the

25

School of Medicine, correct?

        A.    Yes.

        Q.    So she was under the auspices of the
School of Medicine --

        A.    Yes.

        Q.    -- in 2013 and 2014?

        A.    That's correct.  That's right.

        Q.    And it was a different program than the
MD/PhD program --

        A.    That's correct, right.

        Q.    -- for 2013?

        A.    Yeah.

        Q.    So in 2010 and 2011, what type of
classes was she taking with the graduate
school, the PhD school?  Was it combined med
school and graduate school classes?

        A.    So I only have knowledge, really, of
what we did in the medical school, to be honest
with you, sir.  So she would have taken, at that
time, thinking of the curriculum in the fall
semester, she would have taken Gross Anatomy,
Sub Biology and Microanatomy and the Science
and Practice of Medicine, SPM, in the fall.
And in the spring semester, I think the
curriculum at that time was physiology,

26

biochemistry, again, the second semester of science, the Practice of Medicine, Neuroscience. I think those were the major courses that she would have taken. Now she may have taken graduate courses, but I don't know that. I don't know what those courses would have been. I did a similar program. I took the medical school curriculum and then I had my own graduate courses and those were separate from the medical school. And again, they varied individually. So she may have had that. I don't know. That I can't -- I can't attest to that.

Q. The tuition for students who are enrolled in the MD/PhD program, who's the tuition paid to?

A. Well, that I don't know either. I mean, to be honest, again, that's part of the School of Graduate Studies. And it's my impression, again, my understanding, is that they get a stipend so that part of the funding they get would be to help support them while they're in school and then their tuition -- the medical school component of the tuition would be waived. I don't know if the school -- I

27

don't know how they do the -- again, the financial end -- I don't know if they actually transfer funds or not.  I don't know that.  But that's how that -- that's my understanding. They get a stipend as a student and then the tuition for the medical school component is waived.

Q.    And when you're getting paid in 2010 and 2011, is that from the School of Medicine or is that from a larger entity --

A.    Yeah.  I think I'm an employee of the State of Louisiana so I would suppose it comes out of the Board of Regions funding for the Health Science Center, I think.

Q.    Would you consider yourself an employee of the graduate school in 2010 and 2011?

A.    So we have -- I'm part of the graduate faculty, yes.

Q.    When you were working -- well, when you were speaking to Kathryn Frankola and advising her in 2010 and 2011, you were doing that in your capacity as an employee of the LSU School of Medicine?

A.    From my understanding, yes.

Q.    When she was admitted into a hospital

for psychological conditions, were any accommodations made to her or offered to her that you were aware of?

MR. KELLER:

Object to the form.  A specific date would be nice like at which time she was admitted.

BY MR. BETHUNE:

Q.   When she was admitted in 2010 to the hospital.  I believe you said it was River Oaks.

A.   Right.

Q.   Immediately after that, was she offered any accommodations by the School of Medicine or by the graduate school to help her as a student?

A.   I cannot say anything with regard to the graduate school because I can't speak for them.

Q.   Sure.

A.   Fortunately, that first week was mostly orientation and there was no classroom work. So when she returned from the hospital, she just went right into the classroom.  So in terms of any specific accommodations, first

off, I don't know what we would offer anyway. And again, she was ready to come back to class so with that assumption, that she was fit for duty, she continued okay.

Q.    And in your history working at LSU School of Medicine, have you worked with bipolar students at all before?

A.    Yes.

Q.    Have you offered any special accommodations to bipolar students before?

A.    No, sir, not to my knowledge.  I mean, on my end, no.  We haven't had any offer.  I'm not sure what we would offer them anyway.

Q.    Now if there was a request for an accommodation that was made by a student, who would be the proper person to make that request to?  Did you have any rules regarding a request for accommodations?

A.    Sir, that would depend on the type of request, I think.  The most frequent request that we get and 99.9 percent of them are for test accommodations.  And that is usually made through our Office of Student Affairs and Records.  And so they would meet with me, come and talk to me and what we do, we require that

30

they go through a process where they be evaluated by a psychiatrist or a psychologist who is accredited for determining whether or not they have a learning disability.  And then we get a formal report from them.  It's usually 25 or 30 pages long and then that report, that attending psychiatrist or psychologist will make recommendations to us in a written format and we used that to therefore, meet those accommodations when we can.  And it's usually for time and a half or outside, a private testing room which we do have those accommodations.

        MR. BETHUNE:

                Off the record for a second.

                        (Off the record.)

        MR. BETHUNE:

                Back on the record.

BY MR. BETHUNE:

    Q.    So to get back to the accommodations that were made for students, testing accommodations, I'm not asking for names of specific students right now, but what type of accommodations have been made in the past, to your knowledge, for testing for students with

31

psychological disabilities?

A.    Again, those would depend on what came through from their attending psychiatrist or psychologist.  And the accommodations we provide would be extended time on the exam, a quiet environment in an isolated environment. Those are the two accommodations are the several accommodations that we make.

Q.    So extended time on exam, an isolated place to take the exam itself.

A.    Correct.

Q.    What type of psychological disabilities would these type of accommodations be offered to?  I guess, for example, attention deficit disorder?

A.    That's right, ADHD.  Again, that's not for me to determine.  It would be to the psychiatrist or the psychologist and so whatever their recommendations are we go by. Because I can't make -- I mean, I'm not a physician so I can't really make that determinant.

Q.    Sure.

A.    So the student will self-identify and then ask for advice and my advice would be to

32

seek out a physician or a psychiatrist.

Q.   So to seek out a physician or a psychiatrist to recommend accommodations?

A.   That's right, to be evaluated, right.

Q.   And in 2010, was that ever offered to Kathryn Frankola that she should see a psychiatrist or a psychologist to recommend accommodations?

A.   So I believe, and again I'm trying to recall back what I spoke with Kate about. She'd already been seen by medical staff at University Medical -- University Medical Center, at UH, University Hospital.  And so they had referred her to whomever they referred her to.  Again, I don't know who those were. And so she was being seen by a clinical faculty, whether it was a psychiatrist or a psychologist.  So I didn't make any recommendations to them.  I would assume, again, that she would be taking the guidance of her physicians.  She never requested anything that I can recall.

Q.   And maybe to refresh your memory, do you remember her asking if she could not participate in the Camp Tiger program the first

33

year of med school?

A.    Could not participate in the first year?

Q.    If they could waive that requirement.

A.    Well first off, Camp Tiger is a voluntary and it's an elective.  So there is no need to -- she didn't want to come, she didn't have to come.  We don't -- you don't get docked for that.

Q.    Okay.

A.    And you don't get -- you get extra credit maybe as an elective, but you don't -- and I tell the kids when I meet with the students, both incoming and the ones there, that yes, this is a class project, but it's not a requirement.

Q.    Typically, when you dealt with students who were referred to a psychiatrist or a psychologist to determine what kind of accommodations could be made, was that at the request of the student or was that at your suggestion?

A.    No, usually it's the request of a student.  Now -- I guess that's what you're asking.

34

Q.    Yes.

A.    Yeah.

Q.    So would the student say, "I need some special accommodations?"  And we're talking about psychological disabilities.  We're not talking about physical disabilities.

A.    No.  I can give you an example, a typical example.

Q.    Okay.

A.    A young man presents in my office, looks perfectly fine.  He comes to me and he says, "I have a serious problem.  I'm an alcoholic."  He looks perfectly fine.  So my response is, "I'm going to ask you to self refer to our Campus Assistance Program.  I'm not going to do a formal referral because from my perspective, you look perfectly fine.  But if you're having problems that you think you need some advice and help from, I'm going to refer you to Campus Assistance," and that's what I normally do.

Q.    And the Campus Assistance Program, is that always the psychiatrist or psychologist? Do they always handle referring the student to the right medical provider?

35

A. Sure. They meet with them and then they access them. The Campus Assistance has a -- there is a -- there are two social workers in there and the clinical component is a psychiatrist who is a member of the Department of Psychiatry. And so together, that team does an assessment for both faculty, students and staff and family members, as well. And I simply refer the students -- sometimes, it depends on how the situation looks. For instance, if it's this young man, the one specific example I'm thinking of, it was clear that he wanted help and assistance so I picked up the phone and called Mr. Embley and said, "I have a student here who I'm going to send to you that I think should speak with you in an informal way." And he says, "Great. I'm available at 1:00," and I will launch the student to him.

Q. And at that point, would any accommodations, special accommodations be determined by whom?

A. So again, the way the CAP program works for us, is once I have sent you to CAP, you have the right to keep all that information private

36

and they voraciously protect that right.
Sometimes I won't hear anything.  Quite often,
I hear nothing.  That means that -- and I have
nothing from faculty or I hear nothing from the
student.  So that's their business.  Then if
they decide to do a formal referral, then CAP
would call me and say, "Dr. Delcarpio, I think
that Mike needs a formal referral, I would
recommend that you make this agreement with
him," and I'll do that.  But he also has the
right to tell me nothing.  And so then I won't
hear anything.  And so it depends.  Each case is
individual.

Q.   And who refers the School of Medicine
students to the CAP program?

A.   In our policies, anyone can, a fellow
student can.

Q.   A professor could -- okay.

A.   A fellow student can, a professor can,
a staff member can, right.

Q.   And was Ms. Frankola referred to the
CAP program in fall of 2010?

A.   That I just don't recall whether I did
that or Kathy did that because she was already
under professional care from the outside.  To

37

be honest, I just don't recall.  I just simply don't.  Normally, I would have and I would -- again, I just can't recall.

Q.   What happened to plaintiff's status as a student in 2011?  And I understand you mentioned she had some difficulties with a class.  She failed a class and then she was in the MD/PhD program as an out-of-state student. So what happened as a result of that?

A.   So she was dismissed from the PhD component and therefore, dropped from the rolls of the institution.

Q.   And what happened to her?  Do you remember?

A.   I think that -- I mean, again, it's hearsay on my part because I didn't have direct knowledge with her of that, but I know that she had failed physiology and at our promotions meeting in June of that year, we were talking about discussing medical students.  But because she had been dropped from the PhD program, she was not a medical student because she was a non-state resident so she wasn't even on the agenda formally.  Now at the end of the meeting, I know that the department, the course

38

director who happens to be the chairman of the
Committee, Mike Levitzky, said that -- and I
think, again, that's me.  I don't know -- I
didn't see first hand.  I know that I think Mike
said that to Kate that perhaps that, you know,
she could remediate physiology on her own and
that once she established state residency, once
she applies back to the school through the
Readmissions Committee, that he would then
consider that, not guarantee it, but at least
consider that as remediation for physiology.
So that's the last -- that was it.

Q.   So for the 2010/2011 school year, fall
to spring, was Kathryn Frankola given any
special accommodations?

A.   Other than allowing to return after her
stay at River Oaks?  I don't -- no, nothing in
terms of testing and that's about it really.
Again, that's from the medical school's
perspective.  I don't know because again, she's
really under the auspices of the School of
Graduate Studies during that time.

Q.   Well, it's an MD/PhD program.

A.   Right.

Q.   So why would she be under the auspices

39

of the graduate program?

A.    Because she's taking their graduate curriculum.  Even though it's a medical school curriculum, it's part of their PhD requirement for the MD/PhD.

Q.    So when she returned back in 2000 -- what would that be?  That would be 2013, right?

A.    Well, that's actually -- she came back, I think, the 11th, right, in 2011?  She had to take the whole year off -- 2012, she must have come back.

Q.    Yeah.

A.    Yeah, because she had to remain out for the whole year.  She came back in the fall of 2012, I think.

Q.    Was she coming back in the capacity as an MD/PhD student again?

A.    Just as a medical student at this point.

Q.    Just as a medical student.

A.    Right.

Q.    So to the best of your recollection, when did Ms. Frankola return back to LSU?

A.    In the late summer of 2012.

Q.    Late summer of 2012?

40

A.   That's right.  She would have begun as a second year medical student which would put her in, probably July, in mid-summer really.  I don't remember the curriculum back then, when it starts.  But it's usually at the end of June and that first part of the -- the white coat usually is the weekend at the end of July.  So the second or the last week in July is when the second year would have started.

Q.   Did she inform you of a second bipolar episode that she had had in 2011?

A.   She may have.  I don't remember.  There was some correspondence.  I think so, yes.  I don't remember the specifics.

Q.   How did she tell you about it, to the best of your recollection?

A.   Probably an email, I think -- maybe it was email.

Q.   Email?

A.   Right.  Because I think at that time we were communicating via email primarily so that we could set up for her to re-apply and go through the readmissions process at that point.

Q.   I'm going to show you a letter that I have and just take a moment to look through

41

that.

A.   Sure. (Witness reviews document.)

Q.   Do you remember receiving this?

A.   Vaguely.  Let me read this.  I'm a slow reader.  Sorry.  Yeah, I think so.  I'm not sure when I got this, but it seems familiar because I remember the opening statement caught my eye. "Well, here I am again in the psychiatric ward."  And exactly the time line when I got that, gee, I really -- probably, sometime in the late spring, early summer, I guess.  I'm thinking of when those kind of communications usually occur because we have 800 students.

Q.   Sure.  And was this -- to the best of your recollection, was this the first time that she had notified you of this second hospitalization?

A.   I think so.  I'll be honest, I don't recall the timeline of this, but yeah, I think so.  I think so.  That's my recollection, yeah.

MR. BETHUNE:

And I'd just like to attach this correspondence as Exhibit A to the deposition - offer, file and introduce that.

42

MR. KELLER:

No objection.

BY MR. BETHUNE:

Q.    So after she sent you that email, if you want to hold on to a copy of it just to refer to it, if you need it.  After you received that email, what communications did you have with her and what was the substance of those communications?

A.    Well, gee -- again, since I respond to a lot of students, I don't remember exactly what I spoke with her, but I remember what I typically speak with students who have been out for health concerns whether it would be psychiatric or from other physical disability or problem.  You know, my main concern would be is she ready to come back?  Is she healthy enough to come back?  And I would suspect and again, I can't remember the exact verbiage and what I sent her, if I sent her an email or not, just making sure that she was ready to come back full time.  And that was it essentially.

Q.    And this would have been in 2012, right?

A.    Right.  I think -- I think that time,

43

right.

Q.   After she had taken a year --

A.   Well, remember now she was dismissed. So at that point when you're dismissed, you're no longer an LSU student and you're no longer under any of our guidance or regulations.  So she was gone for a year.  Now the Committee allowed her to re-apply as a potential second year, but she has to come before that Committee -- the Readmissions Committee.

Q.   And that was done --

A.   Right, in the summer of 2012.

Q.   And then you received this email?

A.   I'm not sure at what point, either before the meeting or after the meeting.  I don't remember exactly when I would have gotten this, to be honest with you.

Q.   And then moving forward, she was a School of Medicine student in 2012.

A.   Yeah.

Q.   After that was made, are you aware of any accommodations that were offered to her for her psychological/psychiatric condition?

A.   No, not any kind of school accommodations that would have been made.  I

44

know she said in her email here, she's talking about she's going to continue seeing her clinician's -- her physician.  I mean, there's no request here for any kind of accommodations and we didn't see anything from her psychiatrist that I'm aware of or her psychologist requesting accommodations.  Had we gotten that, we would have addressed them, but we never received any from her, that I can recall, no.

Q.    Was she enrolled in the CAP program in 2012, to the best of your recollection?

A.    I don't recall.  I just simply don't recall if she was or not.  I just don't remember in 2012.  To be honest, I really don't, no.

Q.    Did you refer her to the CAP program after receiving that email?

A.    I don't think I did.  I don't recall. I don't remember.  Again, because she was being treated by an outside team.  And there was no need because this was not a stipulation for her to come back.  She was admitted because she had met the requirements in terms of that remediation course.  So this was not even discussed at the readmissions meeting.  That's

45

not part of that -- it wasn't even part of the topic, really.

Q.   And then what happened to her grades in 2012?

A.   Well, she returned that fall semester and the fall curriculum back then, it would have been Pathology, the Science and Practice of Medicine, Microbiology, Immunology and Parasitology which is a combination course. And I think that, as I recall, she failed Pathology.  And she got "Ps" a passing grade in MIP and I think a passing grade in SPM.

Q.   Do you remember how she failed Pathology?  Was it a close fail or was it -- did she --

A.   Aren't they all close?  I don't recall her grades.  I'm sure -- I really just don't recall them.  But I know, probably, very seldom do they get way down in the  40s and  50s so I suspect it was somewhere in the  70s or maybe upper  60s.  I just don't recall her grade, to be honest.

Q.   In working as the Associate Dean of Students, what kind of psychological/psychiatric disabilities have you

46

dealt with with the students?

A.    As we mentioned here, a few folks have had bipolar issues, very few, that I've been aware of.  There may have been others I'm not aware of.

Q.    And this is during your 10-year tenure, right?

A.    Right.

Q.    Because you were there 10 years?

A.    Right, right.  And I think the other one usually is ADHD or substance abuse is one, of course.  And there's been some personality disorders, as well.

Q.    So for the other students with bipolar disorder that you dealt with, do you remember if they were given any special accommodations or if it was recommended, maybe extended testing periods?

A.    So the one that comes to mind that again, and at this point, this student was, I think, in the third and fourth years.  This student had left the program because her bipolar process started back in 2001, I believe.  And then she was gone from school for a couple of years until she was able to return.

47

And in terms of testing, she would have come back then as a third year. That's when I would have been involved with her because she was, at that point, I was a professor in Anatomy and never saw her. So when she came back as a third year, I think the accommodations that may have been made may have been made with, and again, I can't attest to testing. I don't think we -- I don't recall any specific test accommodations for this individual, but what I do recall was that because call is a critical component of a physician's life, particularly as a third year, fourth year and then as a practicing physician, call --

Q. And this being on-call, do you mean?

A. On call, right.

Q. So being available 24/7?

A. Right. That was a problem for this student and accommodations that were made were made in the hospital environment in allowing scheduling to keep her -- to meet her sleep needs. That was one of the triggers for this particular individual. I don't remember the triggers. To be honest, I don't know the triggers for Kate, but you asked me about a

48

case.  So that was the only other case where I can see if any accommodations that were being made. And those were being made from my knowledge, based on the recommendations of this individual psychiatrist because I did see that letter for that particular student and it lists specific comments regarding -- specifically for call.  I don't remember if there were test accommodations.  I just simply don't remember that.  The big thing for us was how to deal with call.

Q.   So she would be allowed the proper amount of sleep --

A.   That's right, so that would prevent triggers --

Q.   -- to prevent recurrence in her bipolar episodes, I guess you'd call them.

A.   Right.

Q.   And that was in about 2005/2006?

A.   Probably 2006/2007, I think.  Yeah.

Q.   Were there any other bipolar students who received any special accommodations besides that student?

A.   Not to my knowledge.

Q.   What was that student's name, to the

49

best of your recollection?

MR. KELLER:

Objection.  Privileged.

MR. BETHUNE:

Is he allowed to answer?

MR. KELLER:

No, privileged.  He's not answering.

MR. BETHUNE:

Okay.  I just want the record to reflect that he's instructing his client not to answer.

BY MR. BETHUNE:

Q.   So besides that student, you also dealt with students who have bipolar -- I mean, I'm sorry, ADHD, substance abuse issues.

A.   Right.

Q.   What kind of special accommodations would be made for the students with ADHD?

A.   Again, it would depend on the report back from their psychiatrist or psychologist. And as I mentioned before, sometimes they'll ask for time and a half which would be again, you know, an hour for the exam plus another half hour, if they need it and then isolation and a quiet environment.  Those are the typical

50

ones and all those usually -- we try to meet all those.  Sometimes we can't meet some of them because of the nature of the exam.

Q.  And did you work with a lot of students who have ADHD or ADD, I don't know what the --

A.  Yeah, right.  It depends on the different diagnosis.  I would suspect that going through the list in my mind of all four years because we would check those students from year to year.  We have enough rooms to accommodate -- we have anywhere between four to seven students out of a class of 200 per year that would be identified as requiring special accommodations.  And again, it varies.  That's just going through my recall here.

Q.  Are the accommodations -- and you said about four to seven students per year?

A.  Per year, right.

Q.  In the med school?

A.  Right.  And those are really -- to be honest, they're only usually dealt with during the first, second and third year.  Because in the fourth year, the curriculum is totally different.  And that would only be for exams during those first, second and third years.

51

Q.    And would -- in your history, would the accommodations ever be offered to them by you so that they would know their options?

A.    No.

Q.    You would just refer them to the CAP program?

A.    Right.  So they would -- I always refer them back to the CAP or to their own psychiatrist or sometimes they'll ask me, do you know anyone who can evaluate us while we had -- I think there was -- we used to have a -- prior to Katrina we had our own folks that did that.  But since Katrina, it was one of the budget cuts that went away.  And so usually I refer them to Ochsner or there was an individual at one time on the main campus, but it's really up to them to find the folks to evaluate them.  We can refer them to CAP and sometimes I'll say, "Why don't you go talk to folks in CAP because they have a list of people who may be able to help you be evaluated." Again, that's not a school providing them, it's just giving you information who's available in the community.

Q.    So typically, I guess in your opinion,

52

whose responsibility would it be to say, you have these options as a student and we can provide specific accommodations.  Who's the proper person to introduce that idea to a student?

MR. KELLER:

Object to the form.  But go ahead and answer.

THE WITNESS:

I suppose it could be either -- it could be either me, a student affairs officer, a faculty member who is aware of the program or the options that students have or CAP.  Usually CAP will do that, as well.  So in terms of -- that would be your three -- your three avenues as a student.

BY MR. BETHUNE:

Q.   So there's no formal --

A.   No, we don't sit up in front of like during orientation and say if you feel you have special needs, please come see Dr. Delcarpio or see Mr. Embley or see Dr. Levitzky.  We don't do that, no.

Q.   So there's no formal --

53

A.    To be perfectly honest, we haven't had to.  Usually the students who are aware that they may have concerns will come and approach us directly.  And that happens all the time during orientation.  Those four or five kids, they'll come and see me.

Q.    Have you ever had a student approach you with some sort of psychological disability and you volunteered that information, that special accommodations could be made?

A.    Sure.

Q.    And how often would that happen with each student who would come to you?

A.    Oh, I don't know, maybe once or twice the year, perhaps.  If there's a student that would have a need that -- usually, again, that format is -- I had a special accommodation when I was in college or in high school.  You guys have that here and I say yes, given that you meet the criteria.

Q.    Sure.  What were the penalties going back to the 2012/2013 school year?  Kate Frankola is now a student at LSU School of Medicine.  What happened to her grades that school year?

54

A.   So again, I wasn't a very -- I wasn't involved in contact with Kate at all in the fall.  In the spring, usually around the middle of March or April is when I'm going to be -- I mean, I did get the fact that she did fail Pathology so we did have that first meeting and we give them a letter saying that you have failed a major course.  No action is going to be taken at this point.  We will have a spring meeting, usually at the end of May or early June; the date to be determined.  At that time, if you have no other -- if there are no other problems academically, more than likely, the Committee will recommend that you be referred back to Pathology to the department for remediation of your grade.  And that's just a template letter I send to every student who's had a failed course.  And to my knowledge, I don't think she failed anything in the spring. I think she did okay at test grades, maybe got a high pass in Psychiatry.  But the rest of the grades were, you know, again, no flags there. And so she would have been brought before the Committee as a single fail.  I don't remember how many students we discussed that year

55

because it can vary from four or five in the first year to four or five in the second year so anywhere from ten to 15 kids, usually that we discuss. She would have been one that we would have talked about almost -- we would have brought up here grades. They would have mentioned -- each course director would say what's my grades, what's your grades and they would just list the grades. And then does anyone have any comments or observations and whatever they say. Most of the time they don't when they have a single fail. And then do we have a motion? The motion would be to refer Ms. Frankola back to the department for remediation and then that's what would have taken place. And she would have gotten an email from me and the letter, a PDF file, of a letter saying that here's what the Committee recommended and you're being referred back to the department.

Q. Do you remember if she was -- if she was made to repeat that second year?

A. So what happened was she was referred back to Pathology and that was the summer, I guess, of 2013; is that right? Yeah. And during her repeat of that course, she failed.

56

So she failed the remediation course.  And at that point --

Q.    Do you remember which course it was?

A.    Path.

Q.    At that point --

A.    Yeah, so at that point, the problem becomes she has failed the course the first time and then she's failed the remediation course which was extremely rare.  So then we have the issue of dismissal versus some other pathway.  And so I contacted the Committee and the Committee recommended that she go ahead and repeat the entire second year on academic probation.  And the Dean agreed and so she repeated -- she began repeating the entire second year in the fall of 20 --

Q.    13.

A.    -- 13, right.  Right, on academic probation.

Q.    And just to make it clear, 2012 to 2013 do you know if she was participating in the CAP program?

A.    I don't know.  She may have been.  I never got any statements to that effect because she can self-refer.

57

Q.   Yes.  Did you refer her or do you remember referring her?

A.   No, I don't remember referring her, not at that time, no.

Q.   I'm going to show you a letter, and give a copy to your lawyer too, and just take a moment to look through that.

A.   (Witness reviews document.)

Q.   Do you remember sending out this letter to Kathryn Frankola?

A.   I think so, sure enough.  Yeah.

Q.   And that's your signature there on this letter?

A.   Right.  Uh-huh (affirmative response).

MR. BETHUNE:

I'd like to attach the August 13, 2013 correspondence as Frankola Exhibit B.  I'll offer, file and introduce that. Any objection?

MR. KELLER:

No objection.

BY MR. BETHUNE:

Q.   In the letter, in the second paragraph, you state that, "I have great faith in you and I know that you will be successful in repeating

58

the second year and that you will shine in your clerkship years."

A.   Sure.

Q.   Can you just tell me why you wrote that?  Was that just a form or was that from you knowing Kate personally?

A.   So one of the things you do in a letter like this that's pretty devastating to a student, you want to give them a little spark of some sense that they can get some encouragement.  So in every letter I write for students that I have to either give them a disciplinary action or a dismissal, I try to give them some insight and a little encouragement.  So that statement there -- when you look at in this particular student's case, I look for things in their past that might be a guidance for me to help write a statement. This young lady was a very bright student and was an MDP student and did very well prior to med school.  And so medical school has been a challenge for her and I know from her activity in Camp Tiger and from her comments from faculty about this student that she was a person who was very caring.  So once she got

59

past the basic Science curriculum, that once she were into a hospital, I felt that this student would probably be very successful with patient care.  And that's all I said there was to give her a sense of encouragement.  That was it.

Q.   And when you say, "Kate, your progress through medical school has been a challenge for you every step of the way," obviously there were academic challenges.  Were you referring to any other challenges?  And you refer to her as Kate, not Kathryn, so I'm assuming that sentence was that you were speaking to her personally, correct?

A.   That's correct, yeah.  So she was a student that when you looked at her, again as an incoming MD/PhD student, great credentials, great promise.  And so that's what I refer to when I said that.  But then when you look at her performance in medical school, she failed something in the first year; she failed something in the second year having a year away.  And so -- and her grades were -- I see -- typical progress in medical student curriculum usually is passes in the first semester, a mix

60

of high passes and some honors in the second semester.  Then in the second year, which is the most challenging of the two basic Science years, even though that's where you would expect just the opposite, grades tend to go up high pass and honors.  Her performance was flat.  In fact, had fails in both years.  So she was an academic challenged student from my perspective.  But I felt that once she got past that, she would do fine in the hospitals because I've seen that in the past.  That's all I'm saying there.

Q.    You mentioned to me how the students are on call for certain years, right?

A.    Third and fourth, yeah.

Q.    Third and fourth years.

A.    And it's not all rotation.  It just depends.

Q.    And how about the second year students, are they ever considered on call?

A.    Well, the curriculum is changing now.  No, not really.  They have some limit of clinical experience in terms of preceptor stuff over the break during the holidays in the first year.  And sometimes they volunteer in the

61

summertime.  But no, there's no requirement for on call in the first and second year.

Q.   And when did Kate first discuss her pregnancy with you?  Do you remember it being in 2013?

A.   Well, I was well aware of it by the time the spring semester came.  But I don't remember if it was in the fall or not.  I just -- to be perfectly honest, I just don't recall. I was aware of it by the spring of 2014. There's no doubt in my mind about that.  But whether she said something in the fall of 2013, I don't recall.  I have to be honest.

Q.   So what happened -- we just saw the August 13, 2013 letter.  What happened with her status as a student for the fall 2013 to spring 2014 school year?

A.   Well, she wasn't on my radar at all.  I mean, I didn't see -- I heard nothing.  I didn't hear anything from her.  I felt that -- again, I didn't feel anything.  I didn't sit down and make notes to myself about it because I had so many other issues with other kids dominating the picture.  But nothing appeared.  I had no flags or anything from Kate.  I didn't hear

62

anything.  There were no complaints.  We had our normal promotions meeting in the spring and I knew that she had passed Pathology because we do a follow up.  I just asked that during our mid-year meeting that everything seemed to be okay.  And that was it really.  So I don't remember if she mentioned something to me in the fall, I just don't recall, to be honest with you.

Q.   And, I guess, you think she told you first about the pregnancy when, in the fall 2013/spring 2014?

A.   I know I was aware of it by the spring of -- by January, sometime in January.  But she could have mentioned something over the fall.  I just don't recall.  So I knew by the beginning of the -- by 2014 that she was expecting, yeah.

Q.   Did you ever recommend to Kate a medical leave of absence?

A.   I did later on in the middle of the spring of 2014.

Q.   If you could, just describe to me when this communication and recommendation took place and was it in person, was it over the phone?

63

A.    It may have been in my office because we met several times that spring as you may be aware of.  And I had grave concerns about her ability to continue to perform academically.

Q.    Why is that?

A.    In late January, I was in my office around lunch time when I got a phone call and a text message from separate students that Ms. Frankola had left class and left all her personal belongings, laptop, everything up, her phone, too, I believe, in the room and class had ended.  And she never returned.  Then at the same time within a few minutes, several students came to my office independent of the other two that had concerns about Kate from a health perspective.  At that time, I decided that since we couldn't locate her on campus and all -- her machine was running and all her personal effects were left there unattended in an empty room, I asked the students to stay with her stuff and I would try and contact her husband and that's what I did.  And so at that time, we met and her husband was present at that time.

Q.    What month was this in?

64

A.   Late January, toward the end of January, I believe.

Q.   Did you know she was pregnant at this time, too?

A.   I think so.  I think that's -- and that may have been when I found out or prior -- I don't recall.  It was -- again, I just don't recall.  I mean, because we have a lot of students who are pregnant, by the way.

Q.   Sure.

A.   So Kate wasn't the first one.  And that's not a big thing for -- well, it's a big thing for them.

Q.   And did you recommend the medical -- so you recommended the medical leave of absence to --

A.   Not at that time.

Q.   Not then?

A.   No, at that time I referred her to Campus Assistance.

Q.   When did you recommend the medical leave of absence?

A.   So later on -- she went to Campus Assistance.  And then I never heard anything which is not unusual as we talked about before.

65

Sometimes they let me know; sometimes they never let me know.  So I think later on, and I don't remember the exact timeline, but maybe a month later I was kind of wondering where she was and where in the process -- I hadn't heard anything.  Had she gone back to class?  Had she been attending school?  I was concerned about that.  And I don't remember how I found out.  I think -- at any rate, at some point within the next month or so it may have been -- oh, I don't recall exactly, February or March. I just don't recall.  It was prior to or right around the second exam, whenever that took place.  Kate came in to see me and I think she was with her husband at that time.  And I asked her if she had been attending class because again, I don't know.  We don't take roll on people who are 30 years old or 20.  So I don't know if she attending.  She said at that time she had not been attending class but that the exams were coming up.  And I asked her how she was doing; how she felt; had she been to CAP.  She had, and that she did tell me that she had been seeing, I think, her psychiatrist.  And again, I don't recall who that was.  And I know that she had

66

not been -- I don't know -- I know that she had not been to class.  And so she was going to go ahead and take these exams and I was very concerned about her ability to pass because she was on academic probation.  Now whether she passed courses in the fall is irrelevant.  She could have had straight honors in the fall.  Had she failed any course in the spring, automatic dismissal.  You're gone.  There's no question.  There's no need to even go back to the Committee.  We've already given you three tries.  It says right there in the letter, a single fail results in automatic dismissal.  So I knew that this young lady was behind the rock and a hard spot.  And I was concerned that she was a very weak student.  So the best of my ability was to advise her was I recommended that you haven't been in attendance, why don't you consider taking a medical leave and getting everything straight, getting your health back. I hadn't gotten any letters from her doctors or anything saying she was ready to come back. And so she was reluctant, but I said, "Kate, if you fail a course, there's no recourse.  I'm going to drop you.  The school will," not me,

67

"the school will drop you automatically that day."  And so she thought about it and she decided to go ahead and take medical leave.

Q.  How did she take the medical leave?  Was that a formal process or did you take care of it for her?  Who notified -- I'm assuming it went --

A.  We do.

Q.  How does it work?

A.  So what it does is when you tell me -- I get a letter from your doctor saying it's in your best interest to take time off.  She could only take medical leave.  She couldn't take personal leave.  If she were in academic good standing, she could take personal leave anytime.  She couldn't do that.  So I then informed the course directors that this student has been placed on medical leave and will be brought back up before the Committee in the summertime.

Q.  And is there a difference -- well, obviously there's a difference between withdrawing as a student and a medical leave of absence.  What are the rules of the medical leave?  What does that usually mean?  What's

68

the process for getting back?

A.    So from the perspective, from the institution's perspective, when you leave, for whatever reason you leave, you are, I think they give them two weeks now.  It was six weeks for a while, but it's two weeks, I think.  At that point, you are dropped from the rolls.  And essentially, you're not a part of the institution.  From the school's leave, when you take a medical leave, you are brought back, particularly when you are a person who is on academic probation.  So when you're on academic probation, you take that medical leave.  We want to make sure that you are ready to come back.  And so you appear before the Readmissions Committee.  And before you do that, I need to have a letter from you saying you're ready to come back.  I need to have a letter from your physician saying that they're ready for you to come back.  And then I'll present you to the Committee and then you can come to the Committee.

Q.    So for Kate's medical leave of absence, she had to go before the Committee to be readmitted?

69

A.    That's correct.  And that's not -- that's typical for any kid who comes back from medical leave who's on academic probation or who was dropped for academic reasons, either way.

Q.    So if she had to be readmitted into the school, it was a possibility for Kate that they would just not readmit her?

A.    It's very rare, but it's true.  And I told her that.

Q.    You told her that when?

A.    The day I told her for the meeting.  I said it's highly unlikely because you're going to come back with a doctor's report that says you're ready to come back.  You're going to be evaluated for Campus Assistance which is one of the requirements, as well, and they're going to say you're ready to come back and then you're going to appear before the Committee and you're going to tell the Committee you have a great plan, you're ready to come back.  And so it's very rare, not 100 percent, life isn't 100 percent, that you're not going to be readmitted.  It's very rare you would not be readmitted.

70

Q.    And is there any written procedure for the medical leave of absence and the readmission procedure too where you could tie these things, the rules of the medical leave in or was this just told to her --

A.    I told it to her, but you know, I'm trying to recall our -- the process we have written there in terms of reappearing before the Committee.  I just don't remember the exact verbiage in our protocol.

Q.    Is there a protocol?  There's a written protocol for medical leave?

A.    So it says that, I think I have that, I didn't read it before because it's been a while since I've looked at this stuff, to be honest.  And I was replaced in March, by the way.  No Deans came on in March of this year.  So there's a process for the leave, yeah.  I'm pretty sure we have that written down.  I recall it in my mind anyway.

Q.    So was that given to her, do you remember, at that meeting?

A.    I don't think I gave it to her at that meeting, but I spoke -- I told it to her, right.

Q.    So I'm just trying to understand during

71

this meeting.  So your position was that she was an at-risk student, she had some exams coming up, correct?

A.    And not been in attendance, right.

Q.    And she was pregnant, right, at the time?

A.    Well, she was pregnant, but I was worried about her not being in attendance more than anything else.

Q.    And she also had the bipolar condition.

A.    That's right, but that was being managed by a physician, as far as I knew.

Q.    So she was at risk of potentially failing the class?

A.    And then being automatically dismissed, that's right.

Q.    Or she can take a medical leave of absence which she did, with the risk of not being readmitted?

A.    That's right, but highly unlikely.

Q.    So what ended up happening to Kate that year?

A.    So she appeared before the Committee. I got the letter from her psychiatrist saying that, it listed a number of stipulations from

72

that psychiatrist saying that Kate would be fit for duty or ready to return to class given these set of criteria. As long as Kate followed these set of criteria then she would be ready to come back to class, that was fine. I got the letter saying she was ready to come back and, I believe, Campus Assistance had evaluated her based on the letter from her psychiatrist and said that they agree that she would be ready to come back. So she had those three documents in place. Her request to come back, her letter from her attending psychiatrist saying given the stipulations then she could come back and the letter from Campus Assistance agreeing with the recommendations and again, reiterating those stipulations from her psychiatrist that she could come back. And then we invited her, along with other students who were in a similar situation, to appear before the Committee. So Kate appeared, as I recall, second in the tier because the other young lady was a "B" and Kate is "F".

Q.   And Kate was in a different tier and that was because she was on academic probation?

A.   That's correct. And she was coming

73

back, right.  And the other person was actually dropped from the rolls for academic reasons, as well.  And she was also on -- she had taken leave, medically, as well.

Q.   So what happened to Kate as far as being readmitted?

A.   So she appeared before the Committee and they asked her the usual questions.  What have you been doing?  What are you up to?  Have you been preparing for this?  And she appeared before the Committee and said that she had been preparing for or studying for Step 2 and she was ready to come back.

Q.   And what happened?

A.   Well, I think the Committee asked her a few or a few of the faculty members asked her about -- they saw the accommodations from her physician, from a psychiatrist.  They also saw -- well, they didn't see those.  We keep those letters private, but they knew that she had been approved by CAP to come back and that her -- that her physicians had agreed to allow her to come back.  We did not -- there was no discussion of her medical conditions during the meeting.  It was mostly academic.  They pointed

74

out to her during the meeting that in every year that she had been in attendance, she had failed at least a single course. And that her performance in medical school was sub par and that even though she had passed the fall semester, that was her third attempt at Pathology. And that here she was now having to take a medical leave and again, they felt that she was very weak from a perspective it would probably not be successful with the step exams. And so they decided to not recommend readmission.

Q.   Did you have any say in that recommendation at all?

A.   Nope.  I don't make a vote.

Q.   You don't have a vote or anything?

A.   No, sir.

Q.   I'm going to show you an email dated June 5, 2014.  And just take a moment to review that.

A.   (Witness reviews document.)

Q.   So this was an email sent by you?

A.   Yep.

Q.   To Kate?

A.   Yep.

75

MR. BETHUNE:

I'd like to attach this as Frankola Exhibit C and offer, file and introduce that.  Any objection?

MR. KELLER:

No objection.

BY MR. BETHUNE:

Q.    So I noticed here you used the term "being readmitted" basically she's going to have to appear before Readmissions and I'm actually referring to the last sentence in paragraph number 2.  "Also, you will need to appear before the Readmissions before you are allowed to redo the second semester."  Was there any other communications that you're aware of in which you discussed the readmission process?

A.    Yeah.  I mean, we talked about that from the beginning, that first time I recommended that she take medical leave. That's part of the process I do with each student.  So I make them understand that here's our process and this is what you need to have done.  This is just to reiterate what I said before probably in the spring.

76

Q.    In your experience, have you ever had any other students take a medical leave and then be denied readmission?

A.    Let me think about that.  To be -- no, I can't recall.  I've had students who have been -- have applied for readmission for other reasons and been denied sequentially twice, the same student.  But in my recollection during my tenure, I cannot recall having a medical student who was on medical leave never be prepared to come back.  Therefore, it was really very rare, and again, I've only done this for ten years and the school's been around a long time.  So no, I can't recall.  Other students for other things, but not -- not for medical, right.

Q.    Did all the students who took medical leave have to appear before the Readmissions Committee?

A.    Only those who are really -- I usually mention them.  But the kids who are on active probation do.  So if you took medical -- if you're in good standing, in effect you broke your leg and couldn't complete the spring semester, that in effect is also a personal

77

leave.  And so many times they will take a personal leave if you're academically okay. But in effect, it's a medical leave.  So I've had them take formal medical leave or formal personal leaves when they've had injuries or some disease process.  And they can do that if they're in academic good standing.  When you're not in academic good standing, they have to appear before the Committee.

Q.   Got it.  So any time a student takes medical leave when they're on academic probation --

A.   That's right.

Q.   -- they have to go before the Readmission Committee?

A.   That's correct.

Q.   Matter of fact, we have -- well, it's not my position anymore, we have a young man coming back this semester that took medical leave and that's exactly the same process.  He was on probation -- there was actually two of them actually.  On probation and he -- he had some personal issues that required him to take a medical leave.  And so he has to appear before the Committee and the young lady, XXXXXXXX

78

(phonetic) too, she has to appear before the Committee, as well.  I shouldn't have told you her name.

MR. KELLER:

True.

BY MR. BETHUNE:

Q.   I'm going to show you a letter.  It's dated November 14, 2014.  Do you remember receiving this letter?

A.   (Witness reviews document.)  Yep. That's part of the thing we talked about that would be presented and that I needed to have in place before I could bring it before the Committee.

MR. BETHUNE:

I'd like to offer, file and introduce that as Frankola Exhibit D and attach that to the deposition.  Any objection?

MR. KELLER:

No objection.

BY MR. BETHUNE:

Q.   And on the last sentence, Scott Embley says, "I recommend consideration be given for administrative referral."  What does he mean

79

there?

A.    So should the Committee accept her application for readmission, what I would do that day is then admit her and she and I would sit down and I would make an administrative referral to Campus Assistance.  So the administrative referral is an agreement between the institution and the student/faculty/staff member that they would then go for appropriate therapy or whatever prescribed process to remain, to continue in school.  So it's in lieu -- it's required for acceptance.  She's going to have to adhere to a set of guidelines, i.e., it would be the guidelines that are probably listed above there.  And if she didn't adhere to those, then she could be subject for dismissal or she could be dropped from the Campus Assistance.  And the way that works is they refer you back to the school.  That's what he means by this.

Q.    We were talking about the medical leave and how when a student is on academic probation and they take a medical leave they have to apply for readmission.

A.    Right.

80

Q.   What's the purpose of that?  Why make a student who's on academic probation be readmitted as opposed to just letting them back?

A.   So historically what has happened in the past was students who, and not in this particular case, but students frequently will, or not that frequently, but at least students have done in the past to escape that spring semester where they're on probation is all of a sudden they become ill.  And so that way they avoid having to face a whole semester where they could fail a course.  So it's a tool that's been used historically.  Not for a long time because we require them to go before that Board again to make sure you're ready to come back.  So that's one of the tools, right.

Q.   When a student is put on academic probation, are they informed in writing of the new rules that apply to them?

A.   What new rules?

Q.   Well, about medical leave.

A.   No.  No, we never tell them about medical leave, no.

Q.   So how the medical leave changes and

81

that you now have to apply for readmission of you take medical leave, there's not a new set of rules that's handed to the students --

A.   No.

Q.   -- once they're placed academic probation?

A.   That's right.  We didn't say you could take medical leave to get out of that.  Now we're not going to tell them that.

Q.   Sure.  How much is the tuition for a typical student at the School of Medicine?

A.   I think they raised it this year now. I think it's about $14K a semester.

Q.   Per semester?

A.   Right.

Q.   So every year about $28,000.00?

A.   Uh-huh (affirmative response).

Q.   And that's about how much plaintiff paid, to the best of your knowledge?

A.   I don't know because she came in under 2010 and I think it's when things started changing and they began to raise the rates almost every semester.  Almost every year the state legislature as the administration pulled funding out of the higher education to balance

82

the state budget there was an attempt to recoup some of that through increases in tuition.  So I don't know what Kate's -- again, I don't know the financial commitments that she has really.

Q.   You mentioned that you have a history of dealing with pregnant students.

A.   Uh-huh (affirmative response).

Q.   What kind of procedures would be given, if any, for women who came to you and told you that they're pregnant and how do I deal with this?  Do you have a protocol?

MR. KELLER:

Object to the form.  Go ahead and answer.

THE WITNESS:

The most frequent time, I guess, in terms of pregnancy, it usually is -- the ones that come to mind are young ladies who begin the medical school curriculum who are pregnant or discover they are pregnant during that first semester. And they will approach the course director in Gross Anatomy to wear a mask.  So one of the problems obviously is the cadavers are preserved in some

83

pretty toxic chemicals and so in order to protect the developing fetus, the school will help them in terms of -- the course director will help them in terms of procuring the appropriate breathing apparatus.

BY MR. BETHUNE:

Q.    Have you ever dealt with students who took a medical leave because of pregnancy?

A.    Yes.

Q.    What had had happened in the past with that?

A.    So again, the most recent example I can think of is a young lady presented again.  She was a freshman and did fine academically, did very well, and asked to take a medical leave in the spring semester of that year so she could have her baby and then come back the next year.  So she was academically strong.  Again, she was taking a personal leave at that point.

Q.    Have you ever had a student who is on academic probation have to take medical leave because of a pregnancy?

A.    Not that I recall, no, sir.

Q.    Your attorney provided a list of names

84

in what's called 26(A) disclosures.  Some of these people I don't know who they are so I'll just ask you whether you know who they were.

A.   Sure.

Q.   Grace Athas, PhD.

A.   Yes.

Q.   Who is she?

A.   She is one of the course directors in the Clinical Pathology course in the spring semester, second year.  But it's changed now. I don't know what the new curriculum is now. She was a Clin Path professor.

Q.   Did she have interactions with Kate Frankola, that you know of?

A.   Personally, other than she's a course director so I'm sure she would have interacted in that capacity as a professor.

Q.   How about Lisa Campeau?

A.   Lisa Campeau is the new course director in Gross Anatomy, Medical Gross Anatomy. Whether she had any interaction with Ms. Frankola, I can't attest to that because, I think, Lisa came on after Kate had moved beyond that course.

Q.   How about Richard DiCarlo?

85

A.   Richard is the Assistant Dean for undergraduate medical education and a clinician.  He would have had, I think, considerable contact with Kate both in the course director, he runs the Science and Practice of Medicine course and he's also involved with scheduling.

Q.   Robin English, M.D.?

A.   Same thing.  Robin is a course director for the Science and Practice of Medicine, now called CSI, which is Clinical Science Introduction.  But she's also the director of undergraduate medical education and I think she would have worked with Kate both in the SBM course and as a director for undergraduate medical education.

Q.   Hamilton Farris?

A.   Ham Farris is the new Assistant Dean for Student Affairs and Records.  He's one of my replacements and Ham would have interacted with Kate maybe in the Neuroscience course.  At that time, he was an instructor.  I don't know if he was the course director at that time, but he may have had that knowledge of her then.

Q.   Who replaced you after you retired?

86

A.    Two people.  They decided to create a second, by my recommendation, there's another Assistant Dean, Hamilton Farris, and the new Associate Dean is, I think, appropriately named, Dr. Lazarus, Cathy Lazarus.

Q.    When you left, and I know this is personal, but did you leave on good terms?

A.    Yeah.  I think so.

Q.    And you voluntarily left?

A.    Yeah.

Q.    So there wasn't any disciplinary action taken?  I have to ask these questions.

A.    No, I understand.  Actually, I told them I was going to leave in the last December, but it took a while for them to find replacements.  Actually, they needed to get the financial structure set up for two assistant deans, an associate and an assistant, so it took a while to get that approved through the State legislature.

Q.    How about Paula Gregory?

A.    Paul Gregory is the course director in Sub Biology and Microanatomy and she would have -- also runs the research program, so she would have been -- she would have known Kate.

Q.    Catherine Hebert?

A.    Cathy -- Khaki Hebert -- Catherine Hebert is a clinician and she practices in the Science of Practice of Medicine.  She's a person who would have known Kate directly as both a member of the Committee because she's a course director and also because she probably was the one who okays their H and P when they do an H and P, history and physical.

Q.    Jeffrey Hobden?

A.    Jeff Hobden is the course director for Microanatomy -- Microbiology, Immunology and Paracytology, the MIP course.  So he knew her both as an instructor and the course director.

Q.    Dan Kapusta?

A.    Dan is similar.  He is the PhD of Pharmacology.  He is the Director of the Pharmacology course, the medical pharm course. He would have known Kate from being an instructor and her course director.

Q.    Michael Levitzky?

A.    Mike is Chairman -- the Head of the Physiology course and he wrote the textbook, literally.  So he would have interacted with Kate quite frequently.

88

Q.   Fred Lopez?

A.   Fred is the other assistant dean for Student Affairs and Records.  So Fred would have known Kate only through interaction with the Committee because he hasn't -- she didn't rate as a third year so she would not have had him in the course.

Q.   Giovanni Lorusso?

A.   Was the course director for Pathology.

Q.   Is Dr. Lorusso, to the best of your knowledge, still working at the School of Medicine?

A.   Yeah.  Giovanni, Dr. Lorusso, has an appointment with the School of Medicine but is also a VA physician.  So I don't think he's working with the School of Medicine, to my knowledge.  As of eight days ago, he was, to my knowledge.

Q.   Was he disciplined for any reason that you know of?

A.   No, not that I would know of, no.  No, sir.

Q.   Robert Maupin?

A.   Robert Maupin, he is the Assistant Dean for Community and Diversity.  So he's our --

89

he's an M.D.  He's a maternal fetal medicine doc and so he would have known Kate as a member of this Committee.  I don't know if she did any -- sometimes they do preceptor stuff.  To my knowledge, he would have been there as the Assistant Dean for Diversity.

Q.   Katherine McDonough, I don't know if I'm pronouncing her name right.

A.   That's right, McDonough.  Kathy is the Assistant -- Associate Dean for School of Graduate Studies, my counterpart in the MD/PhD program.  And she's also a faculty member in Physiology and would have taught Kate Physiology.

Q.   Angela McLean?

A.   Is a -- she's Assistant Director for Diversity.  She is a clinician who's in internal medicine and she would have known Kate probably through the Office of Diversity and also as a member of the Committee.

Q.   Frederick Rodriguez?

A.   Fred is the other faculty member and Co-Director in Clinical Pathology.  He's an M.D. and would have known her from both as an instructor and as the Co-Director of Clin Path.

90

Q.   I'm going to show you a document.  This is listed as an unofficial transcript for Kate Frankola.  It's actually two pages.

A.   Sure.

Q.   Do you recognize this document?

A.   (Witness reviews document.)  Yeah, I recognize the transcripts.  I mean, I recognize the -- there's two pages so page 1 and page 2.

Q.   Is that your handwriting there where it says, "Should be changed to "W"?"

A.   It could be, yep.

Q.   Does that look like your handwriting?

A.   It looks like it could be, yeah.  It looks like it might be mine.

Q.   And also where it says, "Should be changed to "P"?

A.   Yeah.

MR. BETHUNE:

I'd just like to attach this as Frankola Exhibit E, I think we're up to - offer, file and introduce that.

THE WITNESS:

There seems to be something whited out over here though.

MR. KELLER:

91

No objection.

BY MR. BETHUNE:

Q.   What did you mean when you said, "Should be changed to "W"?"

A.   I've got to see what we're talking about here too.

Q.   On that first page there I gave you. And take a moment to review it, if you want.

A.   (Witness reviews document.)  So I'm looking here, I think -- I don't recall.  I'm looking at -- knowing her grades from what I recall her grades are and looking at the spring semester here and she has a fail for Derm.

Q.   And this is spring semester 2013?

A.    13 to  14, right.  And then she has Science and Practice of Medicine and there was a fail there; Introduction to Clinical Pathology, Clinical Med, that's the ICM course; and MIP, she had a pass.  So I think I've highlighted where it says, "General Systemic Pathology," there's a "W" there.  That "W" should be changed to a "P" because she did pass Pathology in the fall.  Do you follow me there?

Q.   The fall of what year?

A.   Of 20 -- of 2013.

92

Q.    So --

A.    So that "W" there should have been a "P" and the other one there is -- should be changed to a "W".  I'm not sure what that's about.  I don't recall what that was about.

Q.    Why was that, if you know, why was that listed as a "W" and what does "W" stand for?

A.    So a "W" usually means Withdrawn and so what happens again, as a course director, the way our grading system works it's done online through People Soft Interface and it's a little tricky in that a grade can be listed in the machine, but will not show up on a transcript until the instructor signs off on the grade.  And so let us say that our faculty are very busy in their environment and that quite often, even though others have gone ahead and the grades were due in the middle of January, the instructor has failed to click the box.  And so I know that perhaps she got this "P" because the instructor gave me the grade, but I can't make that physical myself.  And so that's why it appears as a "W".

Q.    And I see here that on this second section of the first page, there are some

93

fails.  Why are these classes listed as fails?

A.   Which -- on the second page?

Q.   No, on the first -- Science and the
Practice of Medicine.

A.   Up above here (indicating)?

Q.   Yeah.

A.   So I'm not showing the date when this
was printed so there's another thing here too.
I don't know when this one was printed.

Q.   If you look on the left hand side.  It
says, November --

A.   11/21 print date.

Q.   -- 21, 2014.

A.   That's interesting.  That's very early.
That would have been in the fall.  So -- and
again, she had that -- that was probably after
-- These are listed as fails.  If a student has
a "W" -- let me see if I have that up there.  So
usually, for instance, in Kate's case, she took
medical leave early enough where we could have
issued her a "W" grade in these courses.  Now
the Registrar automatically would change a "W"
grade to a fail grade if the next semester
starts.  And so, in this case, this was
generated in November so that meant the summer

94

session started and indeed another fall semester had started.  So had she had incompletes in the spring for those courses like the ones, Science or Practice of Medicine, Pharmacology and Psychiatry of Medicine, she would have gotten incompletes and then since she went to consecutive semesters without remediating those, she got those converted to "S".

Q.    When the Committee met to determine her readmission, did they know that she had taken medical leave in the middle of the semester?

A.    Yes.

Q.    And they did consider those "Fs" in the readmission based on -- did they consider those --

A.    They wouldn't have seen those, I don't think, no.  And had they seen those, they see what they see.  They don't see the transcript. I have the transcript in the folder.  What they see is a PowerPoint display that I take this demographic and make it into a PowerPoint.  So those indiscrepancies are corrected in my PowerPoint.  So in my PowerPoint, it would have showed her those two fail grades as

incompletes.  So they would have seen that as being consistent with what they would expect for a student who was on medical leave.

Q.    So I issued Interrogatories to LSU and I had asked them their policies for allowing students to take a medical leave of absence and thereafter resume taking courses.  I'll show you this and if I can have you refer to Answer to Interrogatory Number 7.  Please just take a look at that and review it.

A.    (Witness reviews document.)  Okay.

Q.    So does that language look familiar to you?

A.    Yeah.

Q.    Where does it come from?

A.    It's from our -- I think it's also located on our website, as well as our policy for procedures.

MR. BETHUNE:

And I'd just like to attach this to the deposition as Frankola Exhibit F. I'll offer, file and introduce that.

MR. KELLER:

No objection.

BY MR. BETHUNE:

96

Q.   So what I'm reading here is that there's a leave of absence for a short period of several weeks up to one year that may be granted to a student in good standing.  Does that sound right?

A.   Yes.

Q.   Then I see in here there's a leave of absence that may be granted for a longer duration and that's for students in good standing too.  Does that sound right?

A.   Yes.

Q.   Does this look like the policy for that?

A.   Right.

Q.   Then I see that there's another option here that students are permitted to withdraw at any time.  And does that sound correct to you?

A.   Yes.

Q.   I don't see anything in this policy about students who are on academic probation and how a leave of absence applies to them.

A.   So I want to draw your attention to right under the Answers to Interrogatory Number 7.  "A leave of absence for a short period of time up to several weeks to a year may be

97

granted to a student of good standing subject to the discretion of the Dean."  So this is where that clause comes into play.  So if I feel, or the Dean feels, that there's a student who has a medical issue that indeed may be a student not in good standing, they could recommend and support their application for medical leave.  So it's this discretion that I -- that I use when I make my recommendations, if that makes sense to you, sir.

Q.   No, no.  I don't want it to -- a leave of absence for a short period.

A.   Or a long period.

Q.   Or a long period, it may be granted subject to the discretion of the Dean.

A.   Yes, sir.

Q.   But it says, "to a student in good standing."

A.   That's right, subject to the discretion of the Dean.  So that's what has been for our -- and this is my predecessor the same -- the same format that Dr. Randall (phonetic) used for his 25 years.

Q.   But she wasn't in good standing?

A.   No.

98

Q.    At the time she took a leave of absence?

A.    No, and that's why it was -- it's to my discretion whether or not.  It's one of the prerogatories of, at least, my limited abilities as an administrator and that's what I did exercise.

Q.    So during that last year of 2013/2014, was Kate Frankola treated differently or given any sort of accommodations by LSU or was she --

A.    During  13/'14, that fall semester and spring semester, not to my knowledge other than us meeting and me recommending that she take a leave and that about -- that I know of.  But that's not really an accommodation, that's just a recommendation.

Q.    And you would agree -- I'm just going back to Answer to Interrogatory Number 7, the leaves of absence that are offered to students here, they're all offered to students in good standing?

A.    Again, I have to say subject to the discretion of the Dean.  And again, students who have medical leave, this is where it falls. They could be in good standing or they can be in

99

poor academic standing.

Q.   But it says before then.  I'm not being argumentative.

A.   Yeah, I know.

Q.   It says that a leave of absence may be given for a student in good standing.

A.   Right.

Q.   Subject to the discretion.  It doesn't say a leave of absence can be given subject to the discretion of the Dean.

A.   That's right.

Q.   So there's no leave of absence here that is afforded, at least in this, in what I have to a student not in good standing.

A.   That's right.  Only if it's a medical leave and that's up to the discretion of the Dean.

MR. BETHUNE:

That's all.  Thank you.  I appreciate it.

*   *   *   *   *

(Whereupon, the deposition in the above-entitled matter was concluded at 11:55 a.m.)

100

R E P O R T E R   S   P A G E

I, DOROTHY N. GROS, Certified Court Reporter in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before who this sworn testimony was taken, do hereby state on the Record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talk overs; that same is the proper method for a Court Reporter's transcription of proceeding, and that the dashes (--) do not indicate that words or phrases have been left out of this transcript;

That any words and/or names which could not be verified through references material have been denoted with the phrase "(phonetic)".

_____

101

DOROTHY N. GROS, CCR


C E R T I F I C A T E


I, Dorothy N. Gros, Certified Court Reporter, in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that the above-mentioned witness, after having been first duly sworn by me upon authority of R.S.37:2554, did testify as hereinbefore set forth;

That the testimony was reported by me, a certified voice writer, and transcribed under my personal direction and supervision, and is a true and correct transcript, to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board;

That I have acted in compliance with the prohibition on contractual relationships, as defined by Louisiana Code of Civil Procedure

102

Article 1434 and in rules and advisory opinions of the board;

That I am not of counsel, not related to counsel or the parties herein, nor am I otherwise interested in the outcome of this matter.

This certification is valid only for a transcript accompanied by my original signature and original required seal on this page.

---------------------------------
Dorothy N. Gros, CCR

103

Certified Court Reporter

State of Louisiana

Certificate No. 90049

Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.

Joseph B. Delcarpio, Ph.D.
June 08, 2016

**$**

**$14K (1)**
 81:13
**$28,000.00 (1)**
 81:16

**1**

**1 (2)**
 11:23;90:8
**1:00 (1)**
 35:18
**10 (2)**
 6:24;46:9
**100 (2)**
 69:22,22
**10-year (1)**
 46:6
**11/21 (1)**
 93:12
**11:55 (1)**
 99:23
**11th (1)**
 39:9
**13 (5)**
 56:17,18;57:16;
 61:15;91:15
**13/'14 (1)**
 98:11
**14 (2)**
 78:8;91:15
**1434 (1)**
 102:1
**1434B (1)**
 100:6
**15 (2)**
 6:24;55:3
**1966 (1)**
 7:5
**1972 (1)**
 13:3
**1973 (2)**
 7:12,14
**1980 (3)**
 7:14,21;13:3
**1981 (2)**
 7:24;8:10
**1986 (1)**
 8:2
**1990 (1)**
 9:13

**2**

**2 (4)**
 11:24;73:12;
 75:12;90:8
**20 (3)**
 56:16;65:18;91:25
**200 (1)**
 50:12

**2000 (2)**
 8:21;39:6
**2001 (1)**
 46:23
**2005 (1)**
 8:25
**2005/2006 (1)**
 48:19
**2006 (1)**
 9:13
**2006/2007 (1)**
 48:20
**2010 (15)**
 15:10;16:22;17:6;
 18:14;19:25;20:22;
 24:1;25:13;27:8,16,
 21;28:9;32:5;36:22;
 81:21
**2010/2011 (2)**
 24:21;38:13
**2011 (9)**
 20:22;21:5;25:13;
 27:9,16,21;37:5;
 39:9;40:11
**2012 (11)**
 39:10,15,24,25;
 42:23;43:12,19;
 44:12,15;45:4;56:20
**2012/2013 (1)**
 53:22
**2013 (12)**
 25:6,11;39:7;
 55:24;56:20;57:17;
 61:5,12,15,16;91:14,
 25
**2013/2014 (2)**
 24:25;98:8
**2013/spring (1)**
 62:12
**2014 (9)**
 25:6;61:10,17;
 62:12,17,21;74:19;
 78:8;93:13
**2015 (1)**
 14:11
**2016 (1)**
 13:10
**21 (1)**
 93:13
**24/7 (1)**
 47:17
**25 (2)**
 30:6;97:23
**26A (1)**
 84:1
**28 (1)**
 100:5

**3**

**30 (2)**
 30:6;65:17
**31st (2)**

**9:15;13:9**
**36 (1)**
 18:4

**4**

**40s (1)**
 45:19

**5**

**5 (1)**
 74:19
**50s (1)**
 45:19

**6**

**60s (1)**
 45:21
**667 (4)**
 5:2,24;6:3;14:2
**67 (1)**
 7:7

**7**

**7 (3)**
 95:9;96:24;98:18
**70560 (2)**
 5:3;6:6
**70s (1)**
 45:20

**8**

**800 (1)**
 41:13
**82 (1)**
 8:10

**9**

**90049 (1)**
 103:3
**99.9 (1)**
 29:21

**A**

**abilities (1)**
 98:6
**ability (4)**
 63:4;66:4,17;
 101:17
**able (2)**
 46:25;51:21
**above (2)**
 79:15;93:5
**above- (2)**
 99:22;101:8
**absence (18)**
 62:19;64:15,22;

**67:24;68:23;70:2;**
 **71:18;95:6;96:2,8,**
 **21,24;97:12;98:2,19;**
 **99:5,9,12**
**absolutely (1)**
 13:14
**abuse (2)**
 46:11;49:15
**academic (24)**
 21:1;56:13,18;
 59:10;60:8;66:5;
 67:14;68:12,12;69:3,
 4;72:24;73:2,25;
 77:7,8,11;79:22;
 80:2,18;81:5;83:22;
 96:20;99:1
**academically (5)**
 54:13;63:4;77:2;
 83:15,19
**accept (1)**
 79:2
**acceptance (1)**
 79:12
**access (1)**
 35:2
**accommodate (1)**
 50:11
**accommodation (3)**
 29:15;53:17;98:15
**accommodations (41)**
 28:2,14,25;29:10,
 18,22;30:10,13,20,
 22,24;31:4,7,8,13;
 32:3,8;33:20;34:4;
 35:21,21;38:15;
 43:22,25;44:4,7;
 46:16;47:6,9,19;
 48:2,9,22;49:17;
 50:14,16;51:2;52:3;
 53:10;73:17;98:10
**accompanied (1)**
 102:10
**according (1)**
 24:5
**accredited (1)**
 30:3
**acquainted (2)**
 14:20;15:8
**act (2)**
 10:8,19
**acted (1)**
 101:23
**acting (2)**
 9:7,14
**action (3)**
 54:8;58:13;86:11
**active (1)**
 76:21
**activity (2)**
 11:17;58:22
**actually (12)**
 7:10;12:7;20:7;
 27:2;39:8;73:1;

**75:11;77:21,22;**
 **86:13,16;90:3**
**ADD (1)**
 50:5
**addition (1)**
 12:10
**address (2)**
 5:23;14:2
**addressed (1)**
 44:8
**ADHD (5)**
 31:16;46:11;
 49:15,18;50:5
**adhere (2)**
 79:13,15
**administration (2)**
 8:20;81:24
**administrative (3)**
 78:25;79:5,7
**administrator (1)**
 98:6
**admission (1)**
 11:9
**Admissions (1)**
 11:15
**admit (1)**
 79:4
**admitted (8)**
 15:2;19:20;22:2,3;
 27:25;28:7,9;44:22
**advice (3)**
 31:25,25;34:19
**advise (2)**
 20:18;66:17
**advising (2)**
 10:17;27:20
**advisor (2)**
 14:24;20:16
**advisory (1)**
 102:1
**Affairs (8)**
 9:1;10:1;11:14;
 20:15;29:23;52:11;
 85:19;88:3
**affirmative (4)**
 24:22;57:14;
 81:17;82:7
**afforded (1)**
 99:13
**afterwards (1)**
 18:17
**Again (59)**
 7:8;10:8;15:9;
 16:21;17:1,19;19:15;
 21:7;22:7;24:14,16;
 26:1,10,18,20;27:1;
 29:2;31:2,16;32:9,
 15,20;35:23;37:3,15;
 38:3,19,20;39:17;
 41:8;42:10,19;44:19;
 46:20;47:7;49:19,22;
 50:14;51:22;53:16;
 54:1,22;59:16;61:20;

Case 2:15-cv-05933-JTM-MBN   Document 29-5   Filed 08/09/16   Page 106 of 118
Kathryn Frankola vs                                              Joseph B. Delcarpio, Ph.D.
Louisiana State University School of Medicine in N.O.                           June 08, 2016

**64:**7;**65:**16,24;**72:**16;
74:8;76:12;80:16;
82:3;83:13,14,19;
92:9;93:16;98:22,23
**agenda (1)**
37:24
**ago (6)**
6:11;16:1;19:5;
20:19;24:18;88:17
**agree (2)**
72:9;98:17
**agreed (3)**
4:2;56:14;73:22
**agreeing (1)**
72:15
**agreement (2)**
36:9;79:7
**ahead (6)**
52:7;56:12;66:3;
67:3;82:13;92:17
**alcoholic (1)**
34:13
**allow (1)**
73:22
**allowed (4)**
43:8;48:12;49:5;
75:14
**allowing (3)**
38:16;47:20;95:5
**almost (3)**
55:5;81:23,23
**along (1)**
72:18
**alumni (1)**
22:4
**alumnus (1)**
22:5
**always (4)**
8:18;34:23,24;
51:7
**AMCAS (1)**
11:1
**American (1)**
8:7
**amount (1)**
48:13
**Anatomy (13)**
7:23;8:1,9,10,20;
10:2;12:21;13:4;
25:21;47:4;82:23;
84:20,20
**and/or (3)**
100:6,14,20
**Angela (1)**
89:15
**anymore (2)**
12:8;77:18
**apartment (1)**
14:14
**apparatus (1)**
83:6
**appear (9)**
68:15;69:19;

**72:**19;**75:**10,13;
76:18;77:9,24;78:1
**appeared (5)**
61:24;71:23;
72:20;73:7,10
**appears (1)**
92:23
**application (3)**
9:5;79:3;97:7
**applications (1)**
11:1
**applied (1)**
76:6
**applies (2)**
38:8;96:21
**apply (4)**
9:3;79:24;80:20;
81:1
**appointed (1)**
9:7
**appointment (1)**
88:14
**appreciate (1)**
99:20
**approach (3)**
53:3,7;82:22
**appropriate (2)**
79:9;83:5
**appropriately (1)**
86:4
**approved (2)**
73:21;86:19
**April (1)**
54:4
**argumentative (1)**
99:3
**around (10)**
6:23;16:3;17:6,15;
18:13,13;54:3;63:7;
65:12;76:13
**arrangements (1)**
11:8
**Article (2)**
100:6;102:1
**assessment (1)**
35:7
**Assistance (12)**
34:15,20,22;35:2,
13;64:20,24;69:16;
72:7,15;79:6,18
**assistant (14)**
8:1,15,16,22;85:1,
18;86:3,17,18;88:2,
24;89:6,10,16
**associate (13)**
8:17;9:1,8,14,25;
11:13,14,20;20:14;
45:23;86:4,18;89:10
**associated (1)**
10:11
**assume (2)**
24:13;32:19
**assuming (2)**

**59:**12;**67:**6
**assumption (1)**
29:3
**Athas (1)**
84:5
**at-risk (1)**
71:2
**attach (6)**
41:22;57:16;75:2;
78:18;90:19;95:20
**attempt (2)**
74:6;82:1
**attendance (4)**
66:18;71:4,8;74:2
**attending (7)**
30:7;31:3;65:7,16,
19,20;72:12
**attention (2)**
31:14;96:22
**attest (3)**
26:12;47:8;84:22
**attorney (2)**
5:9;83:25
**August (6)**
16:22;17:6,11;
18:13;57:16;61:15
**auspices (6)**
21:15,17;23:23;
25:3;38:21,25
**authority (1)**
101:10
**Auto (1)**
7:8
**automatic (2)**
66:9,13
**automatically (3)**
67:1;71:15;93:22
**available (3)**
35:18;47:17;51:23
**avenues (1)**
52:17
**avoid (1)**
80:12
**aware (17)**
5:15;14:23;15:12,
13,20;28:3;43:21;
44:6;46:4,5;52:12;
53:2;61:6,10;62:13;
63:3;75:16
**away (2)**
51:14;59:23

---

## B

**BA (1)**
12:22
**baby (1)**
83:18
**bachelor's (1)**
12:22
**back (69)**
7:18,19;12:14;
17:18;18:17,18,21,

23;19:1;22:5;29:2;
30:18,20;32:10;38:8;
39:6,8,11,14,16,23;
40:4;42:17,18,22;
44:22;45:6;46:23;
47:2,5;49:20;51:8;
53:22;54:15;55:14,
19,23;65:6;66:10,20,
22;67:19;68:1,10,15,
18,20;69:2,14,15,18,
21;72:5,7,10,12,14,
17;73:1,13,21,23;
76:11;77:19;79:19;
80:4,16;83:18;98:18
**background (1)**
12:17
**balance (1)**
81:25
**based (3)**
48:4;72:8;94:15
**basic (3)**
8:19;59:1;60:3
**basically (1)**
75:9
**became (11)**
8:2,7,13,14,16;
9:12,13;14:23;15:7,
11,12
**become (3)**
14:20;19:13;80:11
**becomes (1)**
56:7
**began (4)**
7:24;15:14;56:15;
81:22
**begin (2)**
7:15;82:19
**beginning (4)**
8:10;17:11;62:16;
75:19
**begun (2)**
19:4;40:1
**behavior (3)**
17:3;19:17,17
**behind (1)**
66:14
**belongings (1)**
63:10
**besides (3)**
11:20;48:22;49:13
**best (10)**
39:22;40:16;
41:14;44:12;49:1;
66:16;67:12;81:19;
88:10;101:16
**BETHUNE (28)**
5:6;6:17;22:21;
23:5,20;28:8;30:14,
17,19;41:21;42:3;
49:4,8,12;52:18;
57:15,22;75:1,7;
78:6,15,22;83:7;
90:18;91:2;95:19,25;

99:18
**beyond (1)**
84:23
**big (4)**
13:23;48:10;
64:12,12
**Bill (1)**
13:6
**Bill's (1)**
8:5
**Biochemistry (2)**
13:7;26:1
**Bio-Chemistry (1)**
8:4
**Biological (2)**
12:22,25
**Biology (8)**
8:5,19;10:2;12:21;
13:4,7;25:22;86:23
**bipolar (13)**
15:21;17:16,22;
29:7,10;40:10;46:3,
14,23;48:16,21;
49:14;71:10
**Board (6)**
5:15,17;27:13;
80:15;101:21;102:2
**both (8)**
33:14;35:7;60:7;
85:4,14;87:6,14;
89:24
**bought (1)**
14:10
**box (1)**
92:19
**break (1)**
60:24
**breathing (1)**
83:5
**briefly (2)**
12:18;15:8
**bright (1)**
58:19
**bring (2)**
10:12;78:13
**broke (1)**
76:23
**brought (4)**
54:23;55:6;67:19;
68:10
**budget (2)**
51:14;82:1
**bunch (1)**
5:13
**buses (1)**
16:14
**business (1)**
36:5
**busy (1)**
92:15
**bypass (1)**
9:10

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 107 of 118

Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.

Joseph B. Delcarpio, Ph.D.
June 08, 2016

## C

**cadavers (1)**
82:25
**calendar (1)**
17:13
**call (13)**
15:24;16:15;36:7;
47:11,14,16;48:8,11,
17;60:14,20;61:2;
63:7
**called (4)**
18:11;35:14;84:1;
85:11
**came (14)**
9:6;17:18;21:10;
31:2;39:8,14;47:5;
61:7;63:14;65:14;
70:17;81:20;82:9;
84:23
**camp (11)**
14:25;15:6,10;
20:23,24;22:17,18;
23:11;32:25;33:5;
58:23
**Campeau (2)**
84:18,19
**Campus (13)**
34:15,20,22;35:2;
51:16;63:17;64:20,
23;69:16;72:7,14;
79:6,18
**Can (31)**
5:22;6:21,25;10:3,
18;14:1;30:10;
32:22;34:7;36:16,17,
19,19,20;44:9;48:2;
51:10,18;52:2;55:1;
56:25;58:4,10;68:21;
71:17;77:6;83:13;
92:12;95:8;98:25;
99:9
**candidates (2)**
9:2,11
**CAP (16)**
35:23,24;36:6,15,
22;44:11,16;51:5,8,
18,20;52:14,14;
56:21;65:22;73:21
**capacity (6)**
4:20;9:20;10:17;
27:22;39:16;84:17
**care (3)**
36:25;59:4;67:5
**career (1)**
11:25
**caring (1)**
58:25
**case (9)**
5:8,15;36:12;48:1,
1;58:16;80:7;93:19,
24

**catch (1)**
5:21
**Catherine (2)**
87:1,2
**Cathy (2)**
86:5;87:2
**caught (1)**
41:7
**cause (1)**
5:4
**CCR (2)**
101:1;102:25
**Cell (6)**
8:19;10:2;12:21;
13:4;18:11,11
**Center (2)**
27:14;32:13
**certain (2)**
6:21;60:14
**Certificate (1)**
103:3
**certification (3)**
4:8;13:1;102:9
**Certified (6)**
4:20,24;100:3;
101:5,14;103:1
**certify (1)**
101:8
**chair (1)**
10:10
**chairman (3)**
10:22;38:1;87:22
**challenge (2)**
58:22;59:8
**challenged (1)**
60:8
**challenges (2)**
59:10,11
**challenging (1)**
60:3
**Chancellor (1)**
8:24
**change (1)**
93:22
**changed (7)**
12:2;84:10;90:10,
16;91:4,22;92:4
**changes (2)**
80:25;100:14
**changing (2)**
60:21;81:22
**charge (1)**
10:6
**charges (1)**
11:11
**check (1)**
50:9
**chemicals (1)**
83:1
**children (1)**
22:4
**circumstances (1)**
11:6

**Civil (4)**
4:5;100:6,7;
101:25
**class (18)**
15:2,4;18:18,19;
29:2;33:15;37:7,7;
50:12;63:9,11;65:6,
16,20;66:2;71:14;
72:2,5
**classes (4)**
24:9;25:14,16;
93:1
**classroom (2)**
28:22,24
**clause (1)**
97:3
**Claycomb (1)**
13:6
**Claycomb's (1)**
8:3
**clear (4)**
6:8;19:16;35:12;
56:20
**clerkship (1)**
58:2
**click (1)**
92:19
**client (3)**
14:18;23:7;49:10
**Clin (2)**
84:12;89:25
**Clinical (9)**
10:15;32:16;35:4;
60:23;84:9;85:11;
89:23;91:17,18
**clinician (3)**
85:3;87:3;89:17
**clinician's (1)**
44:3
**close (2)**
45:14,16
**CMS (1)**
13:22
**coat (1)**
40:6
**Code (2)**
100:7;101:25
**Co-Director (2)**
89:23,25
**college (5)**
6:23;7:4,9,10;
53:18
**combination (1)**
45:9
**combined (2)**
20:12;25:15
**coming (5)**
39:16;65:21;71:3;
72:25;77:19
**comments (3)**
48:7;55:10;58:23
**commitments (1)**
82:4

**Committee (44)**
10:10,22,23;11:1,
6,15;22:11;23:17;
38:2,9;43:7,9,10;
54:14,24;55:18;
56:11,12;66:11;
67:19;68:16,21,22,
24;69:19,20;70:9;
71:23;72:20;73:7,11,
15;76:19;77:9,15,25;
78:2,14;79:2;87:6;
88:5;89:3,20;94:10
**Committees (3)**
10:14,16;11:22
**communicating (2)**
20:21;40:21
**communication (1)**
62:23
**communications (4)**
41:12;42:7,9;
75:15
**community (3)**
16:1;51:24;88:25
**complaints (1)**
62:1
**complete (2)**
21:22;76:24
**compliance (2)**
101:20,23
**component (10)**
20:4,6;21:13;
22:13;24:14;26:24;
27:6;35:4;37:11;
47:11
**concern (2)**
19:11;42:16
**concerned (5)**
18:5;19:16;65:7;
66:4,15
**concerns (9)**
16:17,23,24;17:3;
19:14;42:14;53:3;
63:3,15
**concluded (1)**
99:23
**condition (4)**
15:21;17:16;
43:23;71:10
**conditions (2)**
28:1;73:24
**consecutive (1)**
94:7
**consider (6)**
27:15;38:10,11;
66:19;94:14,15
**considerable (1)**
85:4
**consideration (1)**
78:24
**considered (1)**
60:20
**consistent (1)**
95:2

**contact (3)**
54:2;63:21;85:4
**contacted (1)**
56:11
**continue (4)**
22:10;44:2;63:4;
79:11
**continued (2)**
7:25;29:4
**contractual (1)**
101:24
**conversation (5)**
17:25;18:1,8,16;
19:7
**conversations (2)**
17:14,19
**converted (1)**
94:8
**copy (2)**
42:5;57:6
**corrected (1)**
94:23
**correspondence (3)**
40:13;41:23;57:17
**counsel (2)**
102:4,5
**counterpart (2)**
20:12;89:11
**couple (1)**
46:25
**course (46)**
11:23;12:1;21:3;
37:25;44:24;45:9;
46:12;54:8,18;55:7,
25;56:1,3,7,9;66:8,
24;67:17;74:3;
80:13;82:22;83:4;
84:8,9,15,19,24;85:5,
6,9,15,21,23;86:22;
87:7,11,13,14,18,18,
20,23;88:7,9;91:18;
92:9
**courses (8)**
26:4,5,6,9;66:6;
93:21;94:3;95:7
**Court (9)**
4:20,24;5:9,21;
6:8;100:3,15;101:5;
103:1
**create (1)**
86:1
**credentials (1)**
59:17
**credit (1)**
33:12
**criteria (3)**
53:20;72:3,4
**critical (1)**
47:11
**CSI (1)**
85:11
**current (1)**
14:4

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 108 of 118

Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.

Joseph B. Delcarpio, Ph.D.
June 08, 2016

**curriculum (14)**
20:10;25:20,25;
26:8;39:3,4;40:4;
45:6;50:23;59:1,24;
60:21;82:19;84:11
**cuts (1)**
51:14

**D**

**Dan (2)**
87:15,16
**dashes (2)**
100:13,17
**date (5)**
8:14;28:5;54:11;
93:7,12
**dated (2)**
74:18;78:8
**day (5)**
15:25;16:10;67:2;
69:12;79:4
**days (1)**
88:17
**deadlines (1)**
8:16
**deal (2)**
48:10;82:10
**dealing (1)**
82:6
**dealt (6)**
33:17;46:1,15;
49:13;50:21;83:8
**Dean (25)**
9:1,8,14,25;11:13,
15,20;20:14;45:23;
56:14;85:1,18;86:3,
4;88:2,24;89:6,10;
97:2,4,15,20;98:23;
99:10,17
**Deans (2)**
70:17;86:18
**December (1)**
86:14
**decide (2)**
21:23;36:6
**decided (5)**
16:12;63:16;67:3;
74:11;86:1
**decision (1)**
23:9
**defendant (1)**
5:16
**deficit (1)**
31:14
**defined (2)**
100:5;101:25
**degree (6)**
7:16,20;12:20,22,
24,25
**degrees (1)**
12:19
**DELCARPIO (5)**

5:1,7,24;36:7;
52:22
**demographic (2)**
10:25;94:22
**denied (2)**
76:3,7
**denoted (1)**
100:22
**Department (12)**
7:23;8:1,4,8,19;
10:12;13:6;35:5;
37:25;54:15;55:14,
19
**depend (3)**
29:19;31:2;49:19
**Depending (2)**
11:5;17:12
**depends (4)**
35:10;36:12;50:6;
60:18
**deposition (7)**
4:3,14;6:10;41:24;
78:18;95:21;99:22
**Derm (1)**
91:13
**describe (2)**
10:18;62:22
**described (1)**
19:7
**description (2)**
10:3,5
**determinant (1)**
31:22
**determine (3)**
31:17;33:19;94:10
**determined (2)**
35:22;54:11
**determining (1)**
30:3
**devastating (1)**
58:8
**developing (1)**
83:2
**diagnosis (1)**
50:7
**DiCarlo (1)**
84:25
**difference (2)**
67:21,22
**different (4)**
25:8;50:7,24;
72:23
**differently (1)**
98:9
**difficulties (2)**
21:1;37:6
**direct (1)**
37:16
**direction (1)**
101:15
**directly (3)**
12:4;53:4;87:5
**director (21)**

8:22;38:1;55:7;
82:23;83:4;84:16,19;
85:5,9,12,15,23;
86:22;87:7,11,14,17,
20;88:9;89:16;92:9
**directors (2)**
67:17;84:8
**disabilities (5)**
31:1,12;34:5,6;
45:25
**disability (3)**
30:4;42:15;53:8
**disciplinary (2)**
58:13;86:11
**disciplined (1)**
88:19
**disclosures (1)**
84:1
**discourse (1)**
100:12
**discover (1)**
82:20
**discretion (9)**
97:2,8,15,19;98:4,
23;99:8,10,16
**discuss (2)**
55:4;61:3
**discussed (4)**
21:9;44:25;54:25;
75:16
**discussing (1)**
37:20
**discussion (2)**
11:2;73:24
**disease (1)**
77:6
**dismissal (5)**
56:10;58:13;66:9,
13;79:17
**dismissed (4)**
37:10;43:3,4;
71:15
**disorder (2)**
31:15;46:15
**disorders (1)**
46:13
**display (1)**
94:21
**District (1)**
5:9
**Diversity (4)**
88:25;89:6,17,19
**Dixie (1)**
7:4
**doc (1)**
89:2
**docked (1)**
33:8
**doctor (2)**
19:2;67:11
**doctoral (1)**
8:3
**doctors (1)**

66:21
**doctor's (1)**
69:14
**document (9)**
41:2;57:8;74:21;
78:10;90:1,5,6;91:9;
95:11
**documents (1)**
72:11
**dominating (1)**
61:23
**done (5)**
43:11;75:24;
76:12;80:9;92:10
**Dorothy (6)**
4:19,24;100:3;
101:1,5;102:25
**doubt (1)**
61:11
**down (4)**
45:19;61:21;
70:19;79:5
**Dr (11)**
5:7;20:13,17;
21:18;36:7;52:22,23;
86:5;88:10,13;97:22
**draw (1)**
96:22
**drivers (1)**
13:23
**drop (2)**
66:25;67:1
**dropped (6)**
37:11,21;68:7;
69:4;73:2;79:17
**due (2)**
92:18;100:11
**duly (2)**
5:3;101:9
**duration (1)**
96:9
**during (17)**
15:8;38:22;46:6;
50:21,25;52:21;53:5;
55:25;60:24;62:4;
70:25;73:24;74:1;
76:8;82:21;98:8,11
**duties (2)**
10:4;20:17
**duty (2)**
29:4;72:2

**E**

**early (5)**
21:9;41:11;54:10;
93:14,20
**earned (1)**
13:4
**East (3)**
5:24;6:4;14:3
**Eastern (1)**
5:9

**education (5)**
13:24;81:25;85:2,
13,16
**educational (1)**
12:16
**effect (6)**
22:12;24:16;
56:24;76:23,25;77:3
**effects (1)**
63:19
**eight (2)**
13:3;88:17
**either (8)**
11:2;18:15;26:17;
43:14;52:10,11;
58:12;69:4
**elective (2)**
33:6,12
**else (1)**
71:9
**email (13)**
40:17,18,19,21;
42:4,7,20;43:13;
44:1,17;55:16;74:18,
22
**Embley (3)**
35:14;52:23;78:23
**emergency (1)**
15:24
**employed (2)**
9:17,19
**employee (4)**
14:15;27:11,15,22
**employer (2)**
7:3;9:20
**employers (1)**
6:24
**employment (1)**
6:22
**empty (1)**
63:20
**encouragement (3)**
58:11,15;59:5
**end (8)**
17:10;27:2;29:12;
37:24;40:5,7;54:10;
64:1
**ended (2)**
63:12;71:21
**English (1)**
85:8
**enlist (1)**
15:1
**enough (4)**
42:18;50:10;
57:11;93:20
**enrolled (2)**
26:15;44:11
**entailed (1)**
10:4
**enter (1)**
12:7
**entered (1)**

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 109 of 118
Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.

Joseph B. Delcarpio, Ph.D.
June 08, 2016

22:12
**entire (2)**
56:13,15
**entitled (1)**
99:23
**entity (1)**
27:10
**environment (5)**
31:6,6;47:20;
49:25;92:16
**episode (1)**
40:11
**episodes (1)**
48:17
**ER (1)**
16:16
**escape (1)**
80:9
**essentially (2)**
42:22;68:8
**established (1)**
38:7
**evaluate (2)**
51:10,18
**evaluated (5)**
30:2;32:4;51:21;
69:16;72:8
**even (9)**
20:9;37:23;39:3;
44:24;45:1;60:4;
66:10;74:5;92:16
**evidence (1)**
4:16
**exact (4)**
8:14;42:19;65:3;
70:9
**exactly (7)**
19:3,14;41:9;
42:11;43:16;65:11;
77:20
**exam (6)**
31:5,9,10;49:23;
50:3;65:13
**example (5)**
31:14;34:7,8;
35:12;83:13
**exams (6)**
11:24;50:24;
65:20;66:3;71:2;
74:10
**excited (1)**
17:25
**exercise (1)**
98:7
**Exhibit (6)**
41:23;57:17;75:3;
78:17;90:20;95:21
**exigency (1)**
9:9
**ex-officio (2)**
10:8,19
**expect (2)**
60:5;95:2

**expecting (1)**
62:17
**experience (2)**
60:23;76:1
**explained (1)**
22:13
**extended (3)**
31:5,9;46:17
**extra (1)**
33:11
**extremely (1)**
56:9
**eye (1)**
41:7

**F**

**face (1)**
80:12
**facility (1)**
19:21
**fact (5)**
17:23;23:9;54:5;
60:7;77:17
**faculty (12)**
10:11;14:24;
27:18;32:17;35:7;
36:4;52:12;58:24;
73:16;89:12,22;
92:15
**fail (12)**
22:9;45:14;54:5,
24;55:12;66:13,24;
80:13;91:13,17;
93:23;94:25
**failed (17)**
21:2;37:7,18;
45:10,13;54:8,18,19;
55:25;56:1,7,8;
59:20,21;66:8;74:3;
92:19
**failing (1)**
71:14
**fails (4)**
60:7;93:1,1,17
**faith (1)**
57:24
**fall (26)**
7:12;19:25;20:22;
25:20,23;36:22;
38:13;39:14;45:5,6;
54:3;56:16;61:8,12,
16;62:8,11,15;66:6,
7;74:5;91:23,24;
93:15;94:1;98:11
**falls (1)**
98:24
**familiar (2)**
41:6;95:12
**family (1)**
35:8
**far (2)**
71:12;73:5

**Farris (3)**
85:17,18;86:3
**fast (1)**
24:24
**February (1)**
65:11
**Federal (4)**
4:4;13:12,21;
100:5
**feel (5)**
6:20;7:2;52:21;
61:21;97:4
**feels (1)**
97:4
**fellow (4)**
8:3,7;36:16,19
**fellowship (1)**
13:5
**felt (5)**
59:2;60:9;61:20;
65:22;74:8
**fences (1)**
16:6
**fetal (1)**
89:1
**fetus (1)**
83:2
**few (5)**
46:2,3;63:13;
73:16,16
**figure (1)**
16:11
**file (7)**
41:24;55:17;
57:18;75:3;78:16;
90:21;95:22
**filing (1)**
4:8
**financial (4)**
9:8;27:2;82:4;
86:17
**find (2)**
51:17;86:15
**fine (6)**
34:11,13,17;60:10;
72:5;83:15
**finish (1)**
6:15
**finished (1)**
14:14
**first (43)**
5:3;7:1,3;8:16;
10:13;14:20;15:13,
14,14,20,22,25;
16:10;17:7,10;18:16;
21:9;28:21,25;32:25;
33:2,5;38:4;40:6;
41:15;50:22,25;54:6;
55:2;56:7;59:21,25;
60:24;61:2,3;62:11;
64:11;75:19;82:21;
91:7;92:25;93:3;
101:9

**fit (2)**
29:3;72:1
**five (3)**
53:5;55:1,2
**flag (1)**
19:9
**flags (2)**
54:22;61:25
**flat (1)**
60:7
**flowers (1)**
16:6
**focused (1)**
23:4
**folder (1)**
94:20
**folks (7)**
16:13;18:3;19:12;
46:2;51:12,17,20
**follow (2)**
62:4;91:23
**followed (1)**
72:4
**follows (1)**
5:4
**forget (1)**
24:23
**form (5)**
4:12;28:5;52:7;
58:5;82:13
**formal (9)**
30:5;34:16;36:6,8;
52:19,25;67:5;77:4,4
**formalities (1)**
4:7
**formally (1)**
37:24
**format (4)**
30:8;53:17;97:22;
101:20
**forms (1)**
13:15
**forth (1)**
101:11
**Fortunately (1)**
28:21
**forward (3)**
8:11;24:25;43:18
**found (2)**
64:6;65:8
**Foundation (1)**
13:20
**four (6)**
50:8,11,17;53:5;
55:1,2
**fourth (7)**
10:15;12:5;46:21;
47:13;50:23;60:15,
16
**Frankola (27)**
5:8,13;14:18,21;
15:8;17:15;19:24;
20:3;22:25;27:20;

32:6;36:21;38:14;
39:23;53:23;55:14;
57:10,17;63:9;75:2;
78:17;84:14,22;90:3,
20;95:21;98:9
**Fred (4)**
88:1,2,3;89:22
**Frederick (1)**
89:21
**free (1)**
6:20
**frequent (2)**
29:20;82:16
**frequently (3)**
80:7,8;87:25
**freshman (4)**
7:4;15:5,25;83:15
**front (1)**
52:20
**Fs (1)**
94:14
**full (5)**
5:22;8:17;9:14;
11:19;42:22
**full-time (1)**
7:10
**fully (2)**
9:21,22
**funded (2)**
13:17,19
**funding (7)**
13:12,19,20,21;
26:21;27:13;81:25
**funds (1)**
27:3
**further (1)**
4:19

**G**

**gave (5)**
14:2;19:9;70:23;
91:7;92:21
**gee (2)**
41:10;42:10
**general (3)**
7:1;10:5;91:20
**generated (1)**
93:25
**Giovanni (2)**
88:8,13
**given (12)**
38:14;46:16;
53:19;66:11;70:21;
72:2,13;78:24;82:8;
98:9;99:6,9
**giving (1)**
51:23
**goes (1)**
21:23
**good (15)**
67:14;76:23;77:7,
8;86:7;96:4,9;97:1,6,

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 110 of 118
Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.

Joseph B. Delcarpio, Ph.D.
June 08, 2016

17,24;98:20,25;99:6,
14
**Grace (1)**
84:5
**grade (10)**
45:11,12,21;54:16;
92:12,14,21;93:21,
23,23
**grades (21)**
10:24;12:2,6,8,8;
20:9;45:3,17;53:24;
54:20,22;55:6,8,8,9;
59:23;60:5;91:11,12;
92:17;94:25
**grading (1)**
92:10
**graduate (19)**
7:24;20:7,15;
21:18;23:24;24:15;
25:14,16;26:5,9,19;
27:16,17;28:15,18;
38:22;39:1,2;89:11
**graduated (2)**
7:20,25
**granted (4)**
96:4,8;97:1,14
**grave (1)**
63:3
**Great (5)**
35:17;57:24;
59:17,18;69:20
**Gregory (2)**
86:21,22
**Gros (6)**
4:20,24;100:3;
101:1,5;102:25
**Gross (4)**
25:21;82:23;
84:20,20
**ground (1)**
23:12
**guarantee (1)**
38:10
**guess (9)**
14:22;31:14;
33:24;41:11;48:17;
51:25;55:24;62:10;
82:16
**guidance (4)**
11:25;32:20;43:6;
58:18
**guidelines (3)**
79:13,14;101:20
**guys (1)**
53:18

**H**

**half (4)**
13:6;30:11;49:22,
24
**Ham (2)**
85:18,20

**Hamilton (2)**
85:17;86:3
**hand (2)**
38:4;93:10
**handed (1)**
81:3
**handle (1)**
34:24
**handled (2)**
12:3,9
**handwriting (2)**
90:9,12
**happen (1)**
53:12
**happened (13)**
17:17;37:4,9,13;
45:3;53:24;55:22;
61:14,15;73:5,14;
80:5;83:11
**happening (1)**
71:21
**happens (3)**
38:1;53:4;92:9
**happy (1)**
6:21
**hard (1)**
66:15
**head (3)**
6:12;13:25;87:22
**Health (10)**
13:18;15:23;
16:17,23,24;17:2;
27:14;42:14;63:16;
66:20
**healthy (1)**
42:17
**hear (6)**
36:2,3,4,12;61:20,
25
**heard (3)**
61:19;64:24;65:5
**hearsay (1)**
37:16
**Heart (1)**
8:7
**Hebert (3)**
87:1,2,3
**help (8)**
26:22;28:15;
34:19;35:13;51:21;
58:18;83:3,4
**helping (1)**
11:23
**hereby (3)**
4:4;100:9;101:8
**herein (1)**
102:5
**hereinbefore (1)**
101:11
**Here's (5)**
10:23,24,25;55:18;
75:22
**high (4)**

53:18;54:21;60:1,
6
**higher (1)**
81:25
**highlighted (1)**
91:20
**highly (2)**
69:13;71:20
**hired (1)**
7:11
**historically (2)**
80:5,14
**history (6)**
5:14;6:23;29:5;
51:1;82:5;87:9
**Hobden (2)**
87:10,11
**hold (1)**
42:5
**holidays (1)**
60:24
**home (1)**
14:6
**honest (15)**
20:2;25:18;26:18;
37:1;41:18;43:17;
44:15;45:22;47:24;
50:21;53:1;61:9,13;
62:8;70:15
**honors (3)**
60:1,6;66:7
**hospital (6)**
27:25;28:10,23;
32:13;47:20;59:2
**hospitalization (1)**
41:17
**hospitals (1)**
60:10
**hound (1)**
12:4
**hour (2)**
49:23,24
**house (2)**
14:11,12
**husband (3)**
63:22,23;65:15

**I**

**Iberia (4)**
5:2,25;6:6;14:3
**ICM (1)**
91:18
**idea (1)**
52:4
**identified (1)**
50:13
**ie (1)**
79:13
**ill (1)**
80:11
**Immediately (1)**
28:13

**Immunology (2)**
45:8;87:12
**impression (1)**
26:20
**including (1)**
4:7
**incoming (3)**
15:1;33:14;59:17
**incompletes (3)**
94:3,6;95:1
**increases (1)**
82:2
**indeed (2)**
94:1;97:5
**independent (1)**
63:14
**indicate (3)**
19:8;100:13,17
**indicated (1)**
19:9
**indicating (1)**
93:5
**indiscrepancies (1)**
94:23
**individual (5)**
36:13;47:10,23;
48:5;51:16
**individually (1)**
26:11
**individuals (1)**
19:19
**inform (1)**
40:10
**informal (1)**
35:17
**information (3)**
35:25;51:23;53:9
**informed (2)**
67:17;80:19
**injuries (1)**
77:5
**in-person (1)**
18:8
**insight (1)**
58:14
**instance (2)**
35:11;93:19
**instead (1)**
6:12
**instituted (1)**
16:1
**Institution (4)**
13:18;37:12;68:9;
79:8
**institution's (1)**
68:3
**instructing (1)**
49:10
**instructor (8)**
8:10;85:22;87:14,
20;89:25;92:14,19,
21
**interacted (3)**

84:16;85:20;87:24
**interaction (3)**
84:21;88:4;100:11
**interactions (1)**
84:13
**interchangeably (1)**
5:19
**interest (1)**
67:12
**interested (1)**
102:6
**interesting (1)**
93:14
**Interface (1)**
92:11
**interim (1)**
9:7
**internal (1)**
89:18
**Interrogatories (1)**
95:4
**Interrogatory (3)**
95:9;96:23;98:18
**interview (1)**
11:7
**into (11)**
8:20;18:19,24;
19:21;22:12;27:25;
28:24;59:2;69:6;
94:22;97:3
**introduce (7)**
41:24;52:4;57:18;
75:3;78:17;90:21;
95:22
**Introduction (2)**
85:12;91:17
**invited (1)**
72:18
**involved (5)**
11:9,16;47:3;54:2;
85:7
**irrelevant (1)**
66:6
**isolated (2)**
31:6,9
**isolation (1)**
49:24
**issue (2)**
56:10;97:5
**issued (2)**
93:21;95:4
**issues (5)**
19:22;46:3;49:15;
61:23;77:23

**J**

**January (8)**
14:13;21:10;
62:14,14;63:6;64:1,
2;92:18
**Jeff (1)**
87:11

Case 2:15-cv-05933-JTM-MBN   Document 29-5   Filed 08/09/16   Page 111 of 118
Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.
Joseph B. Delcarpio, Ph.D.
June 08, 2016

**Jeffrey (1)**
87:10
**job (3)**
7:21;8:8;10:4
**jobs (1)**
14:23
**Joe (1)**
8:24
**JOSEPH (2)**
5:1,24
**judge (1)**
19:15
**July (3)**
40:3,7,8
**June (5)**
23:18;37:19;40:5;
54:11;74:19

## K

**Kapusta (1)**
87:15
**Kate (43)**
14:23;16:4;18:2;
20:3;32:10;38:5;
47:25;53:22;54:2;
58:6;59:7,12;61:3,
25;62:18;63:15;
64:11;65:13;66:23;
69:7;71:21;72:1,3,
20,22,23;73:5;74:24;
84:13,23;85:4,14,21;
86:25;87:5,19,25;
88:4;89:2,13,18;
90:2;98:9
**Kate's (3)**
68:23;82:3;93:19
**Katherine (3)**
20:13,18;89:7
**Kathryn (10)**
5:7,13;14:18;
17:15;22:24;27:20;
32:6;38:14;57:10;
59:12
**Kathy (2)**
36:24;89:9
**Katrina (4)**
9:6,7;51:12,13
**keep (3)**
35:25;47:21;73:19
**KELLER (17)**
6:14;10:21;22:14,
23;23:3;28:4;42:1;
49:2,6;52:6;57:20;
75:5;78:4,20;82:12;
90:25;95:23
**kept (1)**
16:18
**Khaki (1)**
87:2
**kid (1)**
69:2
**kids (7)**

14:25;16:8;33:13;
53:5;55:3;61:23;
76:21
**kind (10)**
16:23;19:9;33:19;
41:12;43:24;44:4;
45:24;49:17;65:4;
82:8
**knew (11)**
15:22;19:16,20;
21:25;22:6;62:3,16;
66:14;71:12;73:20;
87:13
**knowing (2)**
58:6;91:11
**knowledge (16)**
13:13;24:8;25:17;
29:11;30:25;37:17;
48:4,24;54:18;81:19;
85:24;88:11,17,18;
89:5;98:12
**known (7)**
86:25;87:5,19;
88:4;89:2,18,24

## L

**lab (2)**
8:3,5
**ladies (1)**
82:18
**lady (5)**
58:19;66:14;
72:22;77:25;83:14
**language (1)**
95:12
**laptop (1)**
63:10
**larger (1)**
27:10
**last (9)**
9:23,24;15:11;
38:12;40:8;75:11;
78:23;86:14;98:8
**late (6)**
8:25;39:24,25;
41:11;63:6;64:1
**later (5)**
18:17;62:20;
64:23;65:2,4
**launch (1)**
35:18
**lawyer (1)**
57:6
**Lazarus (2)**
86:5,5
**learning (1)**
30:4
**least (6)**
18:3;38:10;74:3;
80:8;98:5;99:13
**leave (68)**
16:15;62:19;

64:15,22;66:19;67:3,
4,13,14,15,18,23,25;
68:3,4,9,10,13,23;
69:3;70:2,4,12,18;
71:17;73:4;74:8;
75:20;76:2,10,18;
77:1,2,3,4,11,20,24;
79:21,23;80:22,24,
25;81:2,8;83:9,16,
20,22;86:7,14;93:20;
94:12;95:3,6;96:2,7,
21,24;97:8,11;98:1,
14,24;99:5,9,12,16
**leaves (2)**
77:5;98:19
**left (8)**
46:22;63:9,9,19;
86:6,9;93:10;100:18
**leg (1)**
76:24
**legislature (2)**
81:24;86:20
**letter (26)**
18:21,23;40:24;
48:6;54:7,17;55:17,
17;57:5,9,13,23;
58:7,11;61:15;66:12;
67:11;68:17,19;
71:24;72:6,8,12,14;
78:7,9
**letters (2)**
66:21;73:20
**letting (1)**
80:3
**Levitzky (3)**
38:2;52:23;87:21
**license (1)**
11:24
**licenses (1)**
12:19
**lieu (1)**
79:11
**life (2)**
47:12;69:22
**likely (1)**
54:13
**likes (1)**
11:12
**limit (1)**
60:22
**limited (1)**
98:5
**line (1)**
41:9
**Lisa (3)**
84:18,19,23
**list (4)**
50:8;51:20;55:9;
83:25
**listed (7)**
71:25;79:15;90:2;
92:7,12;93:1,17
**listening (1)**

22:22
**lists (1)**
48:6
**literally (1)**
87:24
**little (4)**
19:5;58:9,14;
92:11
**lived (1)**
14:12
**living (1)**
14:9
**locate (1)**
63:17
**located (1)**
95:17
**long (10)**
6:11;7:13;19:6;
20:19;30:6;72:3;
76:14;80:14;97:13,
14
**longer (4)**
9:17;43:5,5;96:8
**look (11)**
34:17;40:25;57:7;
58:16,17;59:19;
90:12;93:10;95:10,
12;96:12
**looked (2)**
59:16;70:15
**looking (3)**
91:10,11,12
**looks (5)**
34:11,13;35:10;
90:13,14
**Lopez (1)**
88:1
**Lorusso (3)**
88:8,10,13
**lot (5)**
13:16,18;42:11;
50:4;64:8
**Louisiana (10)**
4:25;5:2,16;14:3;
27:12;100:4,7;101:6,
25;103:2
**LSU (15)**
5:14,17,18;7:21;
9:19,23;13:12;14:15;
27:22;29:5;39:23;
43:5;53:23;95:4;
98:10
**lunch (1)**
63:7

## M

**machine (2)**
63:18;92:13
**Main (6)**
5:2,24;6:4;14:3;
42:16;51:16
**major (3)**

13:25;26:3;54:8
**makes (1)**
97:10
**making (1)**
42:21
**man (3)**
34:10;35:11;77:18
**managed (1)**
71:12
**managing (2)**
12:1,2
**manner (1)**
23:7
**many (3)**
54:25;61:23;77:1
**March (4)**
54:4;65:11;70:16,
17
**mask (1)**
82:24
**masters (1)**
7:16
**master's (3)**
7:20;12:24,24
**material (2)**
10:25;100:21
**maternal (1)**
89:1
**matter (4)**
4:17;77:17;99:23;
102:7
**Maupin (2)**
88:23,24
**may (29)**
4:21;9:15;11:6;
13:9;14:9;15:10,11;
19:1;26:4,11;40:12;
46:4;47:6,7;51:21;
53:3;54:10;56:23;
63:1,2;64:6;65:10;
85:24;96:3,8,25;
97:5,14;99:5
**Maybe (10)**
6:25;32:23;33:12;
40:17;45:20;46:17;
53:14;54:20;65:3;
85:21
**McDonough (5)**
20:13,14;21:19;
89:7,9
**McDonough's (1)**
20:17
**McLean (1)**
89:15
**MD (4)**
22:13;85:8;89:1,
24
**MD/PhD (14)**
20:4,12;21:15;
22:8;23:21;24:20;
25:9;26:15;37:8;
38:23;39:5,17;59:17;
89:11

Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.

Joseph B. Delcarpio, Ph.D.
June 08, 2016

**MDP (1)**
58:20
**mean (18)**
14:10;17:2;22:24;
26:18;29:11;31:20;
37:15;44:3;47:15;
49:14;54:5;61:19;
64:8;67:25;75:18;
78:25;90:7;91:3
**means (3)**
36:3;79:20;92:8
**meant (1)**
93:25
**med (5)**
25:15;33:1;50:19;
58:21;91:18
**medical (84)**
13:24;15:3;19:21;
20:4,10;21:14;25:18;
26:8,10,24;27:6;
32:11,12,12;34:25;
37:20,22;38:19;39:3,
18,20;40:2;58:21;
59:8,20,24;62:19;
64:14,15,21;66:19;
67:3,4,13,18,23,24;
68:10,13,23;69:3;
70:2,4,12;71:17;
73:24;74:4,8;75:20;
76:2,9,10,16,17,22;
77:3,4,11,19,24;
79:21,23;80:22,24,
25;81:2,8;82:19;
83:9,16,22;84:20;
85:2,13,16;87:18;
93:20;94:12;95:3,6;
97:5,8;98:24;99:15
**medically (1)**
73:4
**Medicine (34)**
5:14,18;7:22;8:18;
15:18,24;22:2;24:9,
12;25:1,4,23;26:2;
27:9,23;28:14;29:6;
36:14;43:19;45:8;
53:24;81:11;85:6,10;
87:4;88:12,14,16;
89:1,18;91:16;93:4;
94:4,5
**meet (10)**
16:8;23:17;29:24;
30:9;33:13;35:1;
47:21;50:1,2;53:20
**meeting (20)**
10:21;11:24;21:9,
11;37:19,25;43:15,
15;44:25;54:6,10;
62:2,5;69:12;70:22,
24;71:1;73:25;74:1;
98:13
**meetings (1)**
10:10
**member (10)**

10:11;35:5;36:20;
52:12;79:9;87:6;
89:2,12,20,22
**members (2)**
35:8;73:16
**memory (1)**
32:23
**mental (1)**
19:14
**mention (1)**
76:21
**mentioned (10)**
17:23;37:6;46:2;
49:21;55:7;60:13;
62:7,15;82:5;101:9
**message (1)**
63:8
**met (5)**
23:18;44:23;63:2,
23;94:10
**Metairie (1)**
7:5
**method (1)**
100:15
**Michael (1)**
87:21
**Microanatomy (3)**
25:22;86:23;87:12
**Microbiology (2)**
45:8;87:12
**middle (4)**
54:3;62:20;92:18;
94:12
**mid-summer (1)**
40:3
**mid-year (1)**
62:5
**might (2)**
58:17;90:14
**Mike (4)**
36:8;38:2,4;87:22
**mind (5)**
46:19;50:8;61:11;
70:20;82:18
**mine (1)**
90:14
**minutes (1)**
63:13
**MIP (3)**
45:12;87:13;91:19
**missing (1)**
16:13
**mix (1)**
59:25
**Molecular (2)**
8:4;13:7
**moment (4)**
40:25;57:7;74:19;
91:8
**month (3)**
63:25;65:4,10
**more (3)**
23:21;54:13;71:8

**Mosbacher (1)**
8:24
**Most (7)**
10:16;18:1;29:20;
55:11;60:3;82:16;
83:13
**mostly (2)**
28:21;73:25
**motion (2)**
55:13,13
**moved (1)**
84:23
**moving (1)**
43:18
**much (2)**
81:10,18
**must (1)**
39:10
**myself (2)**
61:22;92:22

## N

**name (4)**
5:23;48:25;78:3;
89:8
**named (1)**
86:5
**names (3)**
30:22;83:25;
100:20
**National (2)**
13:17,20
**nature (1)**
50:3
**need (14)**
6:24;7:2;33:7;
34:3,19;42:6;44:21;
49:24;53:16;66:10;
68:17,18;75:12,23
**needed (3)**
11:4;78:12;86:16
**needs (4)**
14:25;36:8;47:22;
52:22
**neither (1)**
17:20
**Neuroscience (2)**
26:3;85:21
**New (16)**
5:2,25;6:6;7:22;
11:10;12:23;14:3,14;
16:3;80:20,21;81:2;
84:11,19;85:18;86:3
**next (4)**
7:7;65:10;83:18;
93:23
**nice (1)**
28:6
**nodding (1)**
6:12
**non- (2)**
21:12,25

**non-resident (1)**
21:25
**non-state (4)**
22:1,9,11;37:23
**non-voting (1)**
10:8
**Nope (1)**
74:15
**nor (1)**
102:5
**normal (2)**
9:10;62:2
**normally (2)**
34:21;37:2
**note (1)**
19:2
**notes (1)**
61:22
**noticed (1)**
75:8
**notified (2)**
41:16;67:6
**November (3)**
78:8;93:11,25
**NSF (1)**
13:20
**number (6)**
16:1;71:25;75:12;
95:9;96:23;98:18

## O

**Oaks (3)**
17:4;28:11;38:17
**object (4)**
23:6;28:5;52:7;
82:13
**objection (10)**
42:2;49:3;57:19,
21;75:4,6;78:19,21;
91:1;95:24
**objections (2)**
4:11,11
**observations (1)**
55:10
**obviously (6)**
10:6;13:23;18:6;
59:9;67:22;82:24
**occur (1)**
41:13
**Ochsner (1)**
51:15
**off (8)**
13:25;29:1;30:15,
16;33:5;39:10;
67:12;92:14
**offer (9)**
29:1,12,13;41:24;
57:18;75:3;78:16;
90:21;95:22
**offered (10)**
8:25;28:2,13;29:9;
31:13;32:5;43:22;

51:2;98:19,20
**Office (11)**
8:22;11:13;12:1,3,
9;29:23;34:10;63:1,
6,14;89:19
**officer (3)**
52:12;100:5;101:7
**often (3)**
36:2;53:12;92:16
**okays (1)**
87:8
**old (2)**
7:6;65:18
**on-call (1)**
47:15
**once (8)**
35:24;38:7,7;
53:14;58:25;59:1;
60:9;81:5
**one (36)**
6:1,25;9:2,11;
11:11,21,22;13:23;
14:23,23;16:8,13,15;
18:19;19:13;21:12;
35:11;46:11,11,19;
47:22;51:13,16;55:4;
58:7;64:11;69:16;
80:17;82:24;84:8;
85:19;87:8;92:3;
93:9;96:3;98:4
**ones (5)**
21:23;33:14;50:1;
82:18;94:4
**one-sided (2)**
18:1;19:6
**ongoing (1)**
11:17
**online (1)**
92:10
**only (11)**
11:21;25:17;48:1;
50:21,24;67:13;
76:12,20;88:4;99:15;
102:9
**opening (2)**
8:8;41:7
**opinion (1)**
51:25
**opinions (1)**
102:1
**opposed (1)**
80:3
**opposite (1)**
60:5
**option (1)**
96:15
**options (3)**
51:3;52:2,13
**order (1)**
83:1
**organize (2)**
10:9,9
**orientation (3)**

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 113 of 118
Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.

Joseph B. Delcarpio, Ph.D.
June 08, 2016

28:22;52:21;53:5
**original (2)**
  102:10,11
**Orleans (6)**
  7:11,22;12:23;
  13:2;14:14;16:3
**others (2)**
  46:4;92:17
**otherwise (1)**
  102:6
**out (19)**
  14:14;16:11;21:7,
  24;22:9;27:13;32:1,
  2;39:13;42:13;
  50:12;57:9;64:6;
  65:8;74:1;81:8,25;
  90:24;100:18
**outcome (1)**
  102:6
**outline (1)**
  6:22
**out-of-state (2)**
  22:3;37:8
**outside (4)**
  12:6;30:11;36:25;
  44:20
**over (4)**
  60:24;62:15,24;
  90:24
**overs (1)**
  100:14
**oversee (1)**
  10:7
**overseen (1)**
  20:6
**own (5)**
  14:6;26:8;38:6;
  51:8,12

### P

**page (6)**
  90:8,8;91:7;92:25;
  93:2;102:11
**pages (3)**
  30:6;90:3,8
**paid (3)**
  26:16;27:8;81:19
**painting (1)**
  16:5
**par (1)**
  74:4
**Paracytology (1)**
  87:13
**paragraph (2)**
  57:23;75:12
**Parasitology (1)**
  45:9
**Parish (2)**
  7:11;13:2
**park (1)**
  16:6
**part (15)**

4:14;7:10;8:6;
  22:10;26:18,21;
  27:17;37:16;39:4;
  40:6;45:1,1;68:8;
  75:21;78:11
**participate (4)**
  23:10,14;32:25;
  33:2
**participating (1)**
  56:21
**participation (1)**
  20:23
**particular (4)**
  47:23;48:6;58:16;
  80:7
**particularly (2)**
  47:12;68:11
**parties (2)**
  4:3;102:5
**pass (5)**
  54:21;60:6;66:4;
  91:19,22
**passed (3)**
  62:3;66:6;74:5
**passes (2)**
  59:25;60:1
**passing (2)**
  45:11,12
**past (9)**
  19:12;30:24;
  58:17;59:1;60:9,11;
  80:6,9;83:11
**Path (3)**
  56:4;84:12;89:25
**Pathology (14)**
  45:7,11,14;54:6,
  15;55:23;62:3;74:7;
  84:9;88:9;89:23;
  91:18,21,23
**pathway (1)**
  56:11
**patient (1)**
  59:4
**Paul (1)**
  86:22
**Paula (1)**
  86:21
**pauses (1)**
  100:13
**pay (1)**
  7:18
**PDF (1)**
  55:17
**Pearl (1)**
  14:12
**penalties (1)**
  53:21
**pending (1)**
  5:8
**people (5)**
  51:20;65:17;84:2;
  86:1;92:11
**per (4)**

50:12,17,18;81:14
**percent (3)**
  29:21;69:22,23
**perfectly (5)**
  34:11,13,17;53:1;
  61:9
**perform (1)**
  63:4
**performance (3)**
  59:20;60:6;74:4
**perhaps (3)**
  38:5;53:15;92:20
**period (6)**
  17:15;96:2,24;
  97:12,13,14
**periods (1)**
  46:18
**permission (1)**
  18:20
**permitted (1)**
  96:16
**person (8)**
  10:9;29:16;52:4;
  58:25;62:24;68:11;
  73:1;87:5
**personal (11)**
  63:10,19;67:14,15;
  76:25;77:2,5,23;
  83:20;86:7;101:15
**personality (1)**
  46:12
**personally (3)**
  58:6;59:14;84:15
**perspective (7)**
  34:17;38:20;60:9;
  63:16;68:2,3;74:9
**pharm (1)**
  87:18
**Pharmacology (3)**
  87:17,18;94:5
**PHD (14)**
  5:1;12:20;13:4;
  20:5,11;21:13;22:10;
  24:14;25:15;37:10,
  21;39:4;84:5;87:16
**phone (9)**
  15:23;16:15;
  18:10,11,12;35:14;
  62:25;63:7,11
**phonetic (4)**
  8:24;78:1;97:22;
  100:22
**phrase (1)**
  100:22
**phrases (1)**
  100:18
**physical (4)**
  34:6;42:15;87:9;
  92:22
**physician (12)**
  15:24;17:1,20;
  31:21;32:1,2;44:3;
  47:13;68:19;71:12;

73:18;88:15
**physicians (3)**
  16:16;32:21;73:22
**physician's (1)**
  47:12
**physiology (8)**
  21:1;25:25;37:18;
  38:6,11;87:23;89:13,
  14
**picked (1)**
  35:13
**picture (1)**
  61:24
**place (6)**
  31:10;55:15;
  62:24;65:13;72:11;
  78:13
**placed (2)**
  67:18;81:5
**plaintiff (1)**
  81:18
**plaintiff's (1)**
  37:4
**plan (1)**
  69:21
**planting (1)**
  16:6
**play (1)**
  97:3
**please (3)**
  6:12;52:22;95:9
**plus (1)**
  49:23
**point (17)**
  8:11;19:22;20:10;
  35:20;39:19;40:23;
  43:4,14;46:20;47:4;
  54:9;56:2,5,6;65:9;
  68:7;83:20
**pointed (1)**
  73:25
**policies (2)**
  36:16;95:5
**policy (3)**
  95:17;96:12,19
**poor (1)**
  99:1
**position (5)**
  8:9;9:1,15;71:1;
  77:18
**possibility (1)**
  69:7
**post- (1)**
  8:2
**post-doctoral (1)**
  13:5
**post-Katrina (1)**
  16:7
**potential (1)**
  43:8
**potentially (1)**
  71:13
**PowerPoint (4)**

94:21,22,24,24
**Practice (9)**
  25:23;26:2;45:7;
  85:6,10;87:4;91:16;
  93:4;94:4
**practices (1)**
  87:3
**practicing (1)**
  47:13
**preceptor (2)**
  60:23;89:4
**Pre-Clinical (1)**
  10:14
**predecessor (1)**
  97:21
**pregnancy (5)**
  61:4;62:11;82:17;
  83:9,23
**pregnant (8)**
  64:3,9;71:5,7;82:6,
  10,20,21
**prepare (1)**
  11:23
**prepared (2)**
  76:11;101:19
**preparing (2)**
  73:10,12
**prerogatories (1)**
  98:5
**prescribed (1)**
  79:10
**present (3)**
  10:22;63:23;68:21
**presented (2)**
  78:12;83:14
**presents (1)**
  34:10
**preserved (1)**
  82:25
**pretty (3)**
  58:8;70:18;83:1
**prevent (2)**
  48:14,16
**primarily (1)**
  40:21
**primary (1)**
  10:6
**print (1)**
  93:12
**printed (2)**
  93:8,9
**prior (4)**
  51:12;58:20;64:6;
  65:12
**private (3)**
  30:11;35:25;73:20
**Privileged (2)**
  49:3,7
**probably (19)**
  7:8;14:22,22;
  15:10,13;17:4,18;
  40:3,17;41:10;45:18;
  48:20;59:3;74:10;

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 114 of 118
Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.
Joseph B. Delcarpio, Ph.D.
June 08, 2016

75:25;79:14;87:7;
89:19;93:16
**probation (18)**
56:14,19;66:5;
68:12,13;69:3;72:24;
76:22;77:12,21,22;
79:22;80:2,10,19;
81:6;83:22;96:20
**problem (8)**
15:23;19:19;
21:11;22:7;34:12;
42:16;47:18;56:6
**problems (5)**
9:9;18:5;34:18;
54:13;82:24
**Procedure (6)**
4:5;70:1,3;100:6,
7;101:25
**procedures (2)**
82:8;95:18
**proceeding (2)**
100:12,16
**process (17)**
9:5,6,11;30:1;
40:23;46:23;65:5;
67:5;68:1;70:7,18;
75:17,21,23;77:6,20;
79:10
**processes (1)**
10:7
**procuring (1)**
83:5
**professional (1)**
36:25
**professor (8)**
8:15,17;10:2;
36:18,19;47:4;84:12,
17
**professors (1)**
24:12
**Program (32)**
15:6;20:11,12;
21:22,24;22:8;23:22;
24:16,18,20;25:8,9;
26:7,15;32:25;34:15,
22;35:23;36:15,22;
37:8,21;38:23;39:1;
44:11,16;46:22;51:6;
52:13;56:22;86:24;
89:12
**programs (2)**
13:22;20:5
**progress (2)**
59:7,24
**progression (1)**
8:12
**prohibition (1)**
101:24
**project (2)**
16:2;33:15
**projects (1)**
16:3
**promise (1)**

59:18
**promotion (2)**
10:7;11:5
**Promotions (5)**
10:14,16;11:22;
37:18;62:2
**pronouncing (1)**
89:8
**proper (4)**
29:16;48:12;52:4;
100:15
**protect (2)**
36:1;83:2
**protocol (4)**
70:10,11,12;82:11
**provide (2)**
31:5;52:3
**provided (1)**
83:25
**provider (1)**
34:25
**providing (1)**
51:22
**Ps (1)**
45:11
**psychiatric (2)**
41:8;42:15
**psychiatrist (22)**
30:2,7;31:3,18;
32:1,3,7,17;33:18;
34:23;35:5;44:6;
48:5;49:20;51:9;
65:24;71:24;72:1,9,
13,17;73:18
**Psychiatry (3)**
35:6;54:21;94:5
**psychological (6)**
19:21;28:1;31:1,
12;34:5;53:8
**psychological/psychiatric (2)**
43:23;45:25
**psychologist (10)**
30:2,7;31:4,18;
32:7,18;33:19;34:23;
44:7;49:20
**pulled (1)**
81:24
**pulling (1)**
22:24
**purpose (1)**
80:1
**pursuant (1)**
4:4
**put (2)**
40:2;80:18

**Q**

**quarter (1)**
8:6
**quiet (2)**
31:6;49:25
**Quite (3)**

36:2;87:25;92:16

**R**

**radar (1)**
61:18
**raise (1)**
81:22
**raised (1)**
81:12
**ran (1)**
24:18
**Randall (1)**
97:22
**rare (5)**
56:9;69:9,22,24;
76:12
**rate (2)**
65:9;88:6
**rates (1)**
81:22
**read (2)**
41:4;70:14
**reader (1)**
41:5
**reading (2)**
4:8;96:1
**readmission (11)**
70:3;74:12;75:16;
76:3,6;77:15;79:3,
24;81:1;94:11,15
**Readmissions (8)**
38:9;40:23;43:10;
44:25;68:16;75:10,
13;76:18
**readmit (1)**
69:8
**readmitted (8)**
68:25;69:6,24,25;
71:19;73:6;75:9;
80:3
**ready (18)**
16:14;18:25;29:2;
42:17,21;66:22;
68:14,18,20;69:15,
18,21;72:2,5,6,10;
73:13;80:16
**real (1)**
20:16
**really (24)**
13:8;15:12;17:21;
19:3;20:3,18;21:14;
25:17;31:21;38:18,
21;40:3;41:10;
44:15;45:2,17;50:20;
51:17;60:22;62:6;
76:12,20;82:4;98:15
**reappearing (1)**
70:8
**re-apply (2)**
40:22;43:8
**reason (2)**
68:4;88:19

**reasons (3)**
69:4;73:2;76:7
**recall (40)**
17:21,22;19:3;
20:2;32:10,22;36:23;
37:1,3;41:19;44:10,
13,14,18;45:10,16,
18,21;47:9,10;50:15;
61:9,13;62:8,16;
64:7,8;65:11,12,25;
70:7,19;72:21;76:5,
9,14;83:24;91:10,12;
92:5
**receive (1)**
13:12
**received (4)**
42:6;43:13;44:9;
48:22
**receiving (3)**
41:3;44:17;78:9
**recent (1)**
83:13
**recognize (3)**
90:5,7,7
**recollection (7)**
39:22;40:16;
41:15,20;44:12;49:1;
76:8
**recommend (11)**
16:18;32:3,7;36:9;
54:14;62:18;64:14,
21;74:11;78:24;97:7
**recommendation (4)**
62:23;74:14;86:2;
98:16
**recommendations (6)**
30:8;31:19;32:19;
48:4;72:15;97:9
**recommended (6)**
46:17;55:18;
56:12;64:15;66:17;
75:20
**recommending (1)**
98:13
**record (5)**
30:15,16,18;49:9;
100:9
**Records (7)**
9:2;10:1,9,12;
29:24;85:19;88:3
**recoup (1)**
82:1
**recourse (1)**
66:24
**recurrence (1)**
48:16
**red (1)**
19:9
**redo (1)**
75:14
**refer (17)**
5:16;17:4;34:15,
20;35:9;42:6;44:16;

51:5,7,15,18;55:13;
57:1;59:11,18;79:19;
95:8
**references (1)**
100:21
**referral (6)**
34:16;36:6,8;
78:25;79:6,7
**referred (8)**
32:14,14;33:18;
36:21;54:14;55:19,
22;64:19
**referring (7)**
5:17;23:6;34:24;
57:2,3;59:10;75:11
**refers (1)**
36:14
**reflect (1)**
49:10
**refresh (1)**
32:23
**regard (1)**
28:17
**regarding (2)**
29:17;48:7
**Regions (1)**
27:13
**registered (1)**
19:4
**Registrar (1)**
93:22
**Registrar's (2)**
12:3,9
**registration (2)**
16:10;17:8
**regulations (1)**
43:6
**reiterate (1)**
75:24
**reiterating (1)**
72:16
**related (1)**
102:4
**relationships (1)**
101:24
**reluctant (1)**
66:23
**remain (2)**
39:13;79:11
**remediate (1)**
38:6
**remediating (1)**
94:8
**remediation (6)**
38:11;44:24;
54:16;55:14;56:1,8
**remember (41)**
7:17;8:14,15;16:4;
17:5,9;20:21,25;
32:24;37:14;40:4,12,
14;41:3,7;42:11,12,
19;43:3,16;44:14,19;
45:13;46:15;47:23;

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 115 of 118
Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.
Joseph B. Delcarpio, Ph.D.
June 08, 2016

48:8,9;54:24;55:20;
56:3;57:2,3,9;61:4,8;
62:7;65:3,8;70:9,22;
78:8
**rented (1)**
14:13
**repeat (3)**
55:21,25;56:13
**repeated (1)**
56:15
**repeating (2)**
56:15;57:25
**rephrase (1)**
6:20
**replaced (2)**
70:16;85:25
**replacements (2)**
85:20;86:16
**report (4)**
30:5,6;49:19;
69:14
**reported (1)**
101:13
**Reporter (7)**
4:21,25;5:22;6:8;
100:4;101:6;103:1
**Reporter's (1)**
100:16
**represent (1)**
5:7
**request (9)**
29:14,16,17,20,20;
33:21,23;44:4;72:11
**requested (1)**
32:21
**requesting (1)**
44:7
**require (2)**
29:25;80:15
**required (4)**
77:23;79:12;
101:21;102:11
**requirement (4)**
33:4,16;39:4;61:1
**requirements (2)**
44:23;69:17
**requiring (1)**
50:13
**research (5)**
8:13,22,23;13:17;
86:24
**reserved (1)**
4:13
**residence (2)**
14:4,16
**residences (1)**
14:8
**residency (2)**
13:22;38:7
**resident (4)**
21:13;22:1,6;
37:23
**residents (4)**

22:1,3,9,12
**resources (1)**
13:25
**respond (1)**
42:10
**response (5)**
24:22;34:14;
57:14;81:17;82:7
**responsibilities (2)**
12:11;20:18
**responsibility (2)**
11:20;52:1
**responsible (1)**
20:8
**responsiveness (1)**
4:13
**rest (1)**
54:21
**result (1)**
37:9
**results (1)**
66:13
**resume (1)**
95:7
**retired (6)**
9:15,21,22,23;
13:9;85:25
**return (4)**
38:16;39:23;
46:25;72:2
**returned (4)**
28:23;39:6;45:5;
63:12
**review (3)**
74:19;91:8;95:10
**reviews (7)**
41:2;57:8;74:21;
78:10;90:6;91:9;
95:11
**Richard (2)**
84:25;85:1
**right (83)**
9:20;10:1,20;
13:25;15:7,19;18:25;
19:1,23;22:25;23:2;
24:3,6,10,13,13;25:7,
10;28:12,24;30:23;
31:16;32:4,4;34:25;
35:25;36:1,11,20;
38:24;39:7,9,21;
40:1,20;42:24,25;
43:1,12;46:7,8,10,
10;47:16,18;48:14,
18;49:16;50:6,18,20;
51:7;55:24;56:18,18;
57:14;60:14;65:12;
66:12;70:24;71:4,5,
11,16,20;73:1;76:16;
77:13;79:25;80:17;
81:7,15;89:8,9;
91:15;96:5,10,14,23;
97:19;99:7,11,15
**rising (1)**

15:4
**risk (2)**
71:13,18
**River (4)**
14:12;17:4;28:10;
38:17
**Road (1)**
7:5
**Robert (2)**
88:23,24
**Robin (2)**
85:8,9
**rock (1)**
66:14
**Rodriguez (1)**
89:21
**roll (2)**
16:9;65:17
**rolls (3)**
37:11;68:7;73:2
**room (3)**
30:12;63:11,20
**rooms (1)**
50:10
**rotation (1)**
60:17
**rotations (1)**
12:7
**RS37:2554 (1)**
101:10
**Rule (1)**
100:5
**Rules (10)**
4:5;29:17;67:24;
70:4;80:20,21;81:3;
100:6;101:21;102:1
**running (1)**
63:18
**runs (2)**
85:5;86:24

**S**

**sabbatical (2)**
7:15,18
**same (7)**
63:13;76:8;77:20;
85:9;97:21,21;
100:15
**sat (1)**
6:9
**save (1)**
4:11
**saw (4)**
47:5;61:14;73:17,
18
**saying (11)**
54:7;55:17;60:12;
66:22;67:11;68:17,
19;71:24;72:1,6,13
**SBM (1)**
85:14
**scheduling (2)**

47:21;85:7
**School (78)**
5:14,18;7:12,22,
24;8:18;11:12;15:3,
18;16:12;18:21,24;
20:4,6,10,13,15;
21:18;22:2;23:24;
24:9,12,15;25:1,4,15,
15,16,16,18;26:8,10,
19,23,24,25;27:6,9,
16,22;28:14,15,18;
29:6;33:1;36:14;
38:8,13,21;39:3;
43:19,24;46:24;
50:19;51:22;53:18,
22,23,25;58:21,21;
59:8,20;61:17;65:7;
66:25;67:1;69:7;
74:4;79:11,19;81:11;
82:19;83:3;88:11,14,
16;89:10
**school's (3)**
38:19;68:9;76:13
**science (17)**
7:16;8:19;12:24;
13:20;25:22;26:2;
27:14;45:7;59:1;
60:3;85:5,10,11;
87:4;91:16;93:3;
94:4
**Sciences (3)**
10:16;12:22,25
**Scott (1)**
78:23
**seal (1)**
102:11
**sealing (1)**
4:8
**second (36)**
6:1;8:6;10:13;
15:4,5;17:7,11;
21:10;26:1;30:15;
40:2,8,9,10;41:16;
43:8;50:22,25;55:2,
21;56:13,16;57:23;
58:1;59:22;60:1,2,
19;61:2;65:13;
72:21;75:14;84:10;
86:2;92:24;93:2
**secondary (1)**
13:1
**section (1)**
92:25
**seeing (2)**
44:2;65:23
**seek (2)**
32:1,2
**seemed (1)**
62:5
**seems (2)**
41:6;90:23
**seldom (1)**
45:18

**self (1)**
34:14
**self-identify (1)**
31:24
**self-refer (1)**
56:25
**semester (33)**
15:13,15;20:1,1,
22,23;21:4;25:21,24;
26:1;45:5;59:25;
60:2;61:7;74:6;
75:14;76:25;77:19;
80:10,12;81:13,14,
23;82:21;83:17;
84:10;91:13,14;
93:23;94:2,12;98:11,
12
**semesters (1)**
94:7
**send (3)**
21:7;35:15;54:17
**sending (1)**
57:9
**sense (3)**
58:10;59:5;97:10
**sent (5)**
35:24;42:4,20,20;
74:22
**sentence (3)**
59:13;75:11;78:23
**separate (3)**
6:24;26:9;63:8
**sequentially (1)**
76:7
**serious (1)**
34:12
**service (2)**
16:2,9
**Services (1)**
8:23
**session (1)**
94:1
**set (7)**
40:22;72:3,4;
79:13;81:2;86:17;
101:11
**seven (2)**
50:12,17
**several (5)**
31:8;63:2,13;96:3,
25
**Shariff (1)**
77:25
**shine (1)**
58:1
**short (3)**
96:2,24;97:12
**show (7)**
40:24;57:5;74:18;
78:7;90:1;92:13;
95:7
**showed (1)**
94:25

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 116 of 118
Kathryn Frankola vs                                          Joseph B. Delcarpio, Ph.D.
Louisiana State University School of Medicine in N.O.                    June 08, 2016

**showing (1)**
93:7
**side (1)**
93:10
**signal (1)**
18:3
**signature (2)**
57:12;102:10
**signing (1)**
4:9
**signs (1)**
92:14
**similar (4)**
18:5;26:7;72:19;
87:16
**simply (4)**
35:9;37:1;44:13;
48:9
**single (4)**
54:24;55:12;
66:13;74:3
**sit (3)**
52:20;61:21;79:5
**situation (3)**
21:21;35:10;72:19
**six (3)**
19:5;24:18;68:5
**sleep (2)**
47:21;48:13
**slow (1)**
41:4
**social (1)**
35:3
**Soft (1)**
92:11
**sold (2)**
14:11,13
**someone (1)**
11:13
**sometime (2)**
41:10;62:14
**sometimes (10)**
35:9;36:2;49:21;
50:2;51:9,19;60:25;
65:1,1;89:4
**somewhere (1)**
45:20
**sophomore (1)**
7:9
**sorry (4)**
6:2;12:12;41:5;
49:15
**sort (2)**
53:8;98:10
**sought (1)**
4:15
**sound (3)**
96:5,10,17
**spark (1)**
58:9
**speak (3)**
28:18;35:16;42:13
**speaking (2)**

27:20;59:13
**special (12)**
14:25;29:9;34:4;
35:21;38:15;46:16;
48:22;49:17;50:13;
52:22;53:10,17
**specific (7)**
28:5,25;30:23;
35:12;47:9;48:7;
52:3
**specifically (1)**
48:7
**specifics (1)**
40:14
**speculate (1)**
6:19
**SPM (2)**
25:23;45:12
**spoke (4)**
5:10;32:10;42:12;
70:24
**spontaneous (1)**
100:12
**spot (1)**
66:15
**spring (31)**
8:21,25;9:13;
14:11;20:1,22;21:5,
8;25:24;38:14;
41:11;54:3,9,19;
61:7,10,16;62:2,13,
21;63:2;66:8;75:25;
76:24;80:9;83:17;
84:9;91:12,14;94:3;
98:12
**staff (4)**
12:1;32:11;35:8;
36:20
**stand (1)**
92:7
**standing (15)**
67:15;76:23;77:7,
8;96:4,10;97:1,6,18,
24;98:21,25;99:1,6,
14
**start (1)**
18:25
**started (6)**
7:19;40:9;46:23;
81:21;94:1,2
**starting (1)**
6:23
**starts (2)**
40:5;93:24
**State (14)**
4:25;5:22;9:4;
22:6;27:12;38:7;
57:24;81:24;82:1;
86:20;100:4,9;101:6;
103:2
**statement (3)**
41:7;58:15,18
**statements (1)**

56:24
**status (5)**
9:24;19:14,25;
37:4;61:16
**statute (1)**
101:21
**stay (2)**
38:17;63:20
**Step (6)**
11:23,24;12:13;
59:9;73:12;74:10
**still (4)**
20:11;21:15;
23:16;88:11
**stipend (2)**
26:21;27:5
**stipulated (2)**
4:2,19
**stipulation (2)**
22:5;44:21
**stipulations (3)**
71:25;72:13,16
**straight (2)**
66:7,20
**Street (4)**
5:2,25;6:5;14:3
**strong (1)**
83:19
**structure (1)**
86:17
**Student (91)**
9:1;10:1;11:7,14,
17;15:12,16,17;16:5,
16;19:25;20:11,15;
21:14,15;23:15,16,
23;24:25;27:5;
28:16;29:15,23;
31:24;33:21,24;34:3,
24;35:15,19;36:5,17,
19;37:5,8,22;39:17,
18,20;40:2;43:5,19;
46:20,22;47:19;48:6,
23;49:13;52:2,5,11,
17;53:7,13,15,23;
54:17;58:9,19,20,24;
59:3,16,17,24;60:8;
61:16;66:16;67:17,
23;71:2;75:22;76:8,
10;77:10;79:22;80:2,
18;81:11;83:21;
85:19;88:3;93:17;
95:3;96:4;97:1,4,6,
17;99:6,14
**student/faculty/staff (1)**
79:8
**Students (67)**
9:25;10:7,17,23;
11:10,10,18,23,25;
12:5;15:1;16:3;18:4;
22:8;26:14;29:7,10;
30:21,23,25;33:14,
17;35:7,9;36:15;
37:20;41:13;42:11,

13;45:24;46:1,14;
48:21;49:14,18;50:4,
9,12,17;52:14;53:2;
54:25;58:12;60:13,
19;63:8,14,20;64:9;
72:18;76:2,5,15,17;
80:6,7,8;81:3;82:6;
83:8;95:6;96:9,16,
20;98:19,20,23
**student's (3)**
11:5;48:25;58:16
**Studies (8)**
20:7,16;21:18;
23:24;24:15;26:19;
38:22;89:11
**studying (1)**
73:12
**stuff (5)**
24:18;60:23;
63:21;70:15;89:4
**Sub (3)**
25:22;74:4;86:23
**subject (7)**
79:16;97:1,15,19;
98:22;99:8,9
**substance (3)**
42:8;46:11;49:15
**successful (3)**
57:25;59:3;74:10
**sudden (1)**
80:11
**suggestion (1)**
33:22
**summer (6)**
39:24,25;41:11;
43:12;55:23;93:25
**summertime (2)**
61:1;67:20
**supervision (1)**
101:15
**Supervisors (2)**
5:15,17
**support (3)**
13:22;26:22;97:7
**suppose (2)**
27:12;52:10
**sure (31)**
5:9,20;12:5,15;
13:14,21;14:19;
23:19;28:20;29:13;
31:23;35:1;41:2,5,
14;42:21;43:14;
45:17;53:11,21;
57:11;58:3;64:10;
68:14;70:18;80:16;
81:10;84:4,16;90:4;
92:4
**suspect (4)**
13:16;42:18;
45:20;50:7
**swear (1)**
4:21
**sworn (3)**

5:3;100:8;101:10
**system (1)**
92:10
**Systemic (1)**
91:20

---

**T**

**talk (4)**
19:24;29:25;
51:19;100:14
**talkative (1)**
19:13
**talked (6)**
17:23;21:11;55:5;
64:25;75:18;78:11
**talking (9)**
18:6,6,7;34:4,6;
37:19;44:1;79:21;
91:5
**taught (4)**
7:14;11:19;13:2;
89:13
**teacher (3)**
7:12,13;13:2
**teaching (3)**
8:1,12;12:10
**team (2)**
35:6;44:20
**technically (3)**
20:5;23:15,22
**technician (1)**
7:21
**template (1)**
54:17
**ten (2)**
55:3;76:13
**tend (1)**
60:5
**tenure (4)**
8:12;14:15;46:6;
76:9
**term (2)**
17:22;75:8
**terminal (1)**
12:20
**terms (13)**
10:23;11:25;
28:25;38:18;44:23;
47:1;52:15;60:23;
70:8;82:17;83:3,4;
86:7
**test (4)**
29:22;47:9;48:8;
54:20
**testified (1)**
5:4
**testify (1)**
101:11
**testimony (3)**
100:8;101:7,13
**testing (7)**
30:12,21,25;38:18;

Case 2:15-cv-05933-JTM-MBN    Document 29-5    Filed 08/09/16    Page 117 of 118
Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.    Joseph B. Delcarpio, Ph.D.
June 08, 2016

46:18;47:1,8
**textbook (1)**
  87:23
**therapy (1)**
  79:10
**thereafter (1)**
  95:7
**therefore (3)**
  30:9;37:11;76:11
**thereof (1)**
  4:15
**thinking (4)**
  23:13;25:20;
  35:12;41:12
**third (12)**
  10:15;12:5;46:21;
  47:2,5,12;50:22,25;
  60:15,16;74:6;88:6
**though (6)**
  20:9;39:3;60:4;
  74:5;90:24;92:17
**thought (2)**
  67:2;100:14
**three (5)**
  13:24;52:16,16;
  66:11;72:11
**throughout (1)**
  19:25
**tie (1)**
  70:3
**tier (2)**
  72:21,23
**Tiger (9)**
  15:6;20:23,24;
  22:17,18;23:11;
  32:25;33:5;58:23
**timeframe (1)**
  16:20
**timeline (2)**
  41:19;65:3
**times (2)**
  63:2;77:1
**title (1)**
  9:24
**together (1)**
  35:6
**told (11)**
  12:17;62:10;
  69:10,11,12;70:5,6,
  24;78:2;82:9;86:13
**took (14)**
  7:15,21;8:9;26:7;
  62:23;65:13;76:17,
  22;77:19;83:9;86:15,
  19;93:19;98:1
**tool (1)**
  80:13
**tools (1)**
  80:17
**top (1)**
  13:25
**topic (1)**
  45:2

**totally (1)**
  50:23
**toward (1)**
  64:1
**toxic (1)**
  83:1
**track (1)**
  12:8
**transcribed (1)**
  101:14
**transcript (9)**
  90:2;92:13;94:19,
  20;100:19;101:16,
  19,20;102:10
**transcription (1)**
  100:16
**transcripts (1)**
  90:7
**transfer (1)**
  27:3
**transition (1)**
  12:2
**transitioned (1)**
  15:4
**treated (2)**
  44:20;98:9
**trial (1)**
  4:16
**tricky (1)**
  92:12
**tries (1)**
  66:12
**triggers (4)**
  47:22,24,25;48:15
**true (3)**
  69:9;78:5;101:16
**try (3)**
  50:1;58:13;63:21
**trying (5)**
  16:11;23:4;32:9;
  70:7,25
**tuition (8)**
  20:8;26:14,16,23,
  24;27:6;81:10;82:2
**twice (2)**
  53:14;76:7
**two (12)**
  31:7;35:3;60:3;
  63:15;68:5,6;77:21;
  86:1,17;90:3,8;94:25
**two-fold (1)**
  21:12
**type (5)**
  25:13;29:19;
  30:23;31:12,13
**typical (5)**
  34:8;49:25;59:24;
  69:2;81:11
**Typically (3)**
  33:17;42:13;51:25

**U**

**UH (1)**
  32:13
**unattended (1)**
  63:19
**under (17)**
  8:23;13:6;20:11;
  21:15,21,21;23:23;
  24:15,20;25:3;36:25;
  38:21,25;43:6;81:20;
  96:23;101:14
**undergraduate (3)**
  85:2,13,15
**University (4)**
  12:23;32:12,12,13
**unless (1)**
  22:2
**unlikely (2)**
  69:13;71:20
**UNO (2)**
  7:16;12:25
**unofficial (1)**
  90:2
**unusual (1)**
  64:25
**up (22)**
  21:10;35:14;
  40:22;51:17;52:20;
  55:6;60:5;62:4;
  63:10;65:21;67:19;
  71:3,21;73:9;86:17;
  90:20;92:13;93:5,18;
  96:3,25;99:16
**upon (1)**
  101:10
**upper (1)**
  45:21
**use (3)**
  5:18;15:3;97:9
**used (8)**
  4:15,15;30:9;
  51:11;75:8;80:14;
  97:22;100:13
**using (1)**
  17:22
**usual (2)**
  8:12;73:8
**usually (29)**
  11:14;15:10;16:5;
  17:9,9;18:10;29:22;
  30:5,10;33:23;40:5,
  7;41:13;46:11;50:1,
  21;51:14;52:14;53:2,
  16;54:3,10;55:3;
  59:25;67:25;76:20;
  82:17;92:8;93:19

**V**

**VA (1)**
  88:15
**Vaguely (1)**
  41:4
**valid (1)**

102:9
**varied (1)**
  26:10
**varies (2)**
  17:12;50:14
**vary (1)**
  55:1
**verbiage (2)**
  42:19;70:10
**verified (1)**
  100:21
**versus (1)**
  56:10
**via (1)**
  40:21
**Vice- (1)**
  8:23
**voice (1)**
  101:14
**voluntarily (1)**
  86:9
**voluntary (1)**
  33:6
**volunteer (1)**
  60:25
**volunteered (1)**
  53:9
**volunteers (2)**
  14:24;15:3
**voraciously (1)**
  36:1
**vote (4)**
  11:4,4;74:15,16

**W**

**Wait (1)**
  6:1
**waive (1)**
  33:4
**waived (3)**
  4:9;26:25;27:7
**waiver (1)**
  20:8
**ward (1)**
  41:9
**way (13)**
  6:21;11:21;16:7;
  35:17,23;45:19;59:9;
  64:9;69:5;70:16;
  79:18;80:11;92:10
**weak (2)**
  66:16;74:9
**wear (1)**
  82:23
**website (1)**
  95:17
**week (8)**
  15:11,14;17:7,10,
  11;18:16;28:21;40:8
**weekend (1)**
  40:7
**weeks (5)**

68:5,5,6;96:3,25
**Western (1)**
  7:8
**what's (6)**
  16:20;55:8,8;
  67:25;80:1;84:1
**whenever (3)**
  17:8;23:17;65:13
**Whereupon (1)**
  99:22
**white (1)**
  40:6
**whited (1)**
  90:23
**whole (4)**
  5:12;39:10,14;
  80:12
**whomever (1)**
  32:14
**who's (8)**
  10:11;26:15;
  51:23;52:3;54:17;
  69:3;80:2;89:17
**Whose (2)**
  21:17;52:1
**William (1)**
  8:3
**Winn (1)**
  7:4
**withdraw (1)**
  96:16
**withdrawing (1)**
  67:23
**Withdrawn (1)**
  92:8
**within (3)**
  8:17;63:13;65:9
**without (1)**
  94:7
**witness (15)**
  4:21;22:19;23:1,8;
  41:2;52:9;57:8;
  74:21;78:10;82:15;
  90:6,22;91:9;95:11;
  101:9
**women (1)**
  82:9
**wondering (1)**
  65:4
**words (4)**
  15:2;19:10;
  100:17,20
**work (3)**
  28:22;50:4;67:9
**worked (7)**
  7:7,9,17,23;8:5;
  29:6;85:14
**workers (1)**
  35:3
**working (9)**
  8:21;11:17;13:13;
  24:11;27:19;29:5;
  45:23;88:11,16

Kathryn Frankola vs
Louisiana State University School of Medicine in N.O.

Joseph B. Delcarpio, Ph.D.
June 08, 2016

**works (3)**
  35:23;79:18;92:10
**worried (1)**
  71:8
**write (2)**
  58:11,18
**writer (1)**
  101:14
**writing (1)**
  80:19
**written (5)**
  30:8;70:1,8,11,19
**wrote (2)**
  58:4;87:23

## Y

**year (70)**
  7:9,24;8:6,7;9:16;
  10:13,15;13:5;15:4,
  5,25;16:4;17:8,12,
  12;23:18;33:1,3;
  37:19;38:13;39:10,
  14;40:2,9;43:2,7,9;
  47:2,6,12,13;50:10,
  10,12,17,18,22,23;
  53:15,22,25;54:25;
  55:2,2,21;56:13,16;
  58:1;59:21,22,22;
  60:2,19,25;61:2,17;
  70:17;71:22;74:2;
  81:12,16,23;83:17,
  18;84:10;88:6;
  91:24;96:3,25;98:8
**years (19)**
  12:6;13:3;16:1;
  18:4;19:5;24:18;
  46:9,21,25;50:9,25;
  58:2;60:4,7,14,16;
  65:18;76:13;97:23
**Yep (4)**
  74:23,25;78:10;
  90:11
**young (9)**
  34:10;35:11;
  58:19;66:14;72:22;
  77:18,25;82:18;
  83:14

## Z

**zip (1)**
  6:6

Associated Reporters, Inc.
(504) 529-3355